1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

PLAINTIFFS' DAUBERT MOTION RE: JAMES BORDEN

Case No. EDCV 15-00033-DTB

Atkinson-Baker Court Reporters
www.depo.com

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4

5                    *   *   *   *   *

6    REANNA HERMOSILLO AS GUARDIAN  )
     AD LITEM FOR C.E.L.R., ET AL., )
7                                   )
              PLAINTIFFS,           ) Case No.:
8                                   ) EDCV
     VS.                            ) 15-00033DTB
9                                   )
     THE COUNTY OF SAN BERNARDINO,  )
10   ET AL.,                        )
                                    )
11         DEFENDANTS.              )

12

13            DEPOSITION OF JAMES W. BORDEN

14          Taken at Hampton Inn & Suites
                    1:55 p.m.
15          On Tuesday, October 25, 2016

16             6575 South Eastern Avenue
                    Meeting Room
17               Las Vegas, Nevada

18

19

20
     Job File No.: AAOB1C9
21

22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   (800) 288-3376
     www.depo.com
24
     REPORTED BY:  Julie M. Lever,
25                 RPR, CCR No.: 582

                                                      1

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    JAMES W. BORDEN,

 2            having been first duly sworn,

 3            testified as follows:

 4                     EXAMINATION

 5   BY MR. PACHOWICZ:

 6        Q.   Good afternoon, sir.  How are you?

 7        A.   I'm fine.  Thank you.

 8        Q.   Please state your name for the record.

 9        A.   James W. Borden. B-O-R-D-E-N.

10        Q.   And, Mr. Borden, do you currently have,

11   we'll call it a day job?

12        A.   I do.

13        Q.   What is that?

14        A.   I am a police officer with the City of

15   Henderson, Nevada.

16        Q.   And how long have you been a police

17   officer with the City of Henderson?

18        A.   March 2, 1997.

19        Q.   And you're not here today in your

20   official capacity as an employee of the City of

21   Henderson, are you?

22        A.   I am not.

23        Q.   You're here as an expert designated by

24   the defense in the case here, correct?

25        A.   That is correct.
```

4

James W. Borden
October 25, 2016

1    provided to plaintiffs.  Have you done that?

2         A.   Can you ask that question again?

3         Q.   Sure.  You were asked to produce all

4    items cited in your opinions that have not

5    already been provided to plaintiffs.

6         A.   There is nothing else.

7         Q.   Did you review any California P.O.S.T.

8    learning domains, for example?

9         A.   I never did review P.O.S.T domains.  I

10   reviewed policy for the department and training

11   records.

12        Q.   Are you P.O.S.T. certified in

13   California?

14        A.   No, sir.

15        Q.   And you didn't review any P.O.S.T.

16   domains put out in California, correct?

17        A.   No.

18        Q.   Is there a reason that you didn't?

19        A.   I was basically more concerned with the

20   policy of the department, best practices of the

21   department because department training is

22   mandated to be P.O.S.T. certified.

23        Q.   Does the San Bernardino Police

24   Department have a policy regarding use of force

25   that uses a continuum of force?

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    of what will refer to now on as Exhibit No. 210

2    is page one is Bates page 2425, and Exhibit No.

3    210 ends on Bates page 2439, correct?

4           MS. POWELL:  Yes.

5    BY MR. PACHOWICZ:

6           Q.   So tell me about your educational

7    background.

8           A.   Where would you like me to start, sir?

9           Q.   Do you have a high school degree?

10          A.   A high school diploma, yes, sir.

11          Q.   And any college?

12          A.   I've got college credits but I don't

13    have a degree.

14          Q.   And how many college credits do you

15    have?

16          A.   I'm not exactly sure.  Do you mind if I

17    look at my CV?

18          Q.   Sure.

19          A.   I have thirty-nine credits from my

20    academy.  I have eighteen additional credits with

21    the focus on human behavior and psychology which

22    is the education I have from the Force Science

23    Institute in the certification for an analyst and

24    the advanced certification and specialist in

25    force science.

James W. Borden
October 25, 2016

1    deem as their designated cover officer.

2          Q.    They being San Bernardino?

3          A.    San Bernardino, correct.

4          Q.    So they're usually off, and laying off

5    what?

6          A.    Distancewise.

7          Q.    So to your knowledge a designated cover

8    officer would be the individual that furnished

9    the weapon?

10         A.    At my department, yes, but I can't

11   comment on San Bernardino. I didn't review the

12   tactics, I should say.

13         Q.    You did or did not?

14         A.    I did not review the tactics.

15         Q.    When you say you didn't review the

16   tactics, what do you mean by that?

17         A.    Meaning that different SWAT teams have

18   different tactics and they call their team

19   different things and they call each person in

20   their team different things.  I wasn't aware of

21   what each officer in that incident, what they

22   were determined to be in that team.

23               I know there is a Hasty Team and there

24   is a sniper. Those are the two things that I'm

25   aware of.

60

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    familiar with them to the extent that I comment
 2    on them.  I am familiar with policy and how these
 3    officers were trained by their department.
 4         Q.    So you would consider yourself an
 5    expert in the P.O.S.T domains, correct?
 6         A.    No, sir.
 7         Q.    In California?
 8         A.    Not in California, no, sir.
 9         Q.    And you would consider yourself an
10    expert in knowing what P.O.S.T requires of
11    officers in California, correct?
12         A.    I do not claim to be an expert in that,
13    but I do know that P.O.S.T requires police
14    departments and sheriffs departments to adhere to
15    a specific minimum standard, and I know that
16    San Bernardino and Victorville do adhere to that
17    standard.
18         Q.    But you don't know what that standard
19    is?
20         A.    I do not.  I only know what their
21    policy and what their training is.
22         Q.    So that I'm clear, you know that they
23    meet the minimum standard, correct?
24         A.    They're required to meet the minimum
25    standard, yes.
```

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.    Now, as a police officer you have to

 2   have an understanding of what your protected gear

 3   can do and not do, correct?

 4        A.    Yes, sir.

 5        Q.    Just like you have to understand how

 6   many bullets you can fire and what they're going

 7   to penetrate depending on the type of gun you

 8   have, correct?

 9        A.    Yes, sir.

10        Q.    Does the City of Henderson have a

11   BearCat?

12        A.    No, sir -- yes, we do have a BearCat.

13   We don't have a tactical tractor but we have a

14   BearCat.

15        Q.    And one of the things that is available

16   to anyone who has an interest is how protective a

17   BearCat is, correct?

18        A.    Yes, sir.

19        Q.    So if you wanted to find out for

20   yourself what kind of weaponry you would be safe

21   in that BearCat against, you could find that out

22   in moments, correct?

23        A.    Yes, sir.

24        Q.    Do you know off the top of your head?

25        A.    What type of rounds will penetrate a
```

85

James W. Borden
October 25, 2016

1    BearCat?

2         Q.    Yes.

3         A.    I don't know it off the top of my head,

4    but I do know there are high-powered rifles,

5    uranium depleted, those types of thing that will

6    penetrate a BearCat but I'm not an expert in that

7    and I don't claim to know.

8              I know there is no place that you're

9    completely safe from flying bullets.

10        Q.    Have you ever heard of a GoPro?

11        A.    I have.

12        Q.    What is it?

13        A.    It's a camera.

14        Q.    Have you ever used one?

15        A.    Yes, sir.

16        Q.    Do you know how much they cost?

17        A.    Yes, sir.

18        Q.    How much?

19        A.    The models I have got are $299ish.    Now

20   I think they've probably gone up.

21        Q.    Now, any idea why the San Bernardino

22   Sheriffs Department doesn't mount GoPro on the

23   BearCat?

24              MS. POWELL:    Objection.    Calls for

25   speculation.

86

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    went and they hit the bee hive?

2         A.   I can't really comment on that.

3         Q.   Well, they rammed the house, right?

4         A.   Yes.

5         Q.   And at least one of the reasons for

6    ramming the house was to get Mr. Rodarte to come

7    out at that moment in time, correct?

8         A.   Yes, but it's all in an effort to

9    de-escalate and control the scene because at this

10   point they're on the scene for several hours.

11        Q.   Okay.

12        A.   And there has got to be a plan in

13   place, and if that's part of their plan, then

14   it's part of the plan.

15        Q.   You don't have an opinion as to whether

16   or not it was a good plan or a bad plan, do you?

17        A.   No, I don't.  That's not my expertise.

18        Q.   There were other options available,

19   correct?

20            MS. POWELL: It calls for speculation.

21   It's beyond this expert's opinion.

22            THE WITNESS: That's what I was going to

23   say.

24   BY MR. PACHOWICZ:

25        Q.   So you didn't consider in formulating

98

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    your opinions whether there were better options

 2    available?

 3         A.   I didn't.  My opinion is strictly

 4    formulated on the events that occurred, not

 5    potential events but actual events.

 6         Q.   It was in Oregon or Washington when we

 7    kept watching the news day after day where the

 8    Starrs sat in their house and they wouldn't come

 9    out.  Do you remember that?

10         A.   I remember something but I don't know

11    where that happened.

12         Q.   I mean it wasn't forever but it was a

13    long time?

14         A.   Yes.

15              MS. POWELL:  Well, if he said he isn't

16    familiar.

17    BY MR. PACHOWICZ:

18         Q.   So let me ask you this.  When you ram

19    someone's house as a police officer with a

20    tractor, do you think that the individual who is

21    going to come out the front of his house is going

22    to be happy or sad?

23              MS. POWELL:  Objection.  Irrelevant.

24    Calls for speculation.  It's beyond.  He's not

25    rendering opinions about the use of a tactical
```

James W. Borden
October 25, 2016

1    tractor.

2           THE WITNESS: I have no opinion about

3    that.

4    BY MR. PACHOWICZ:

5        Q.   Well, you take into account that an

6    individual, Mr. Rodarte, said "fuck you" to the

7    police, right?

8        A.   Yes, sir.

9        Q.   That's part of your totality of the

10   circumstances?

11       A.   Yes, sir.

12       Q.   And that he flipped off the cops?

13       A.   Yes, sir.

14       Q.   Now, you used that to justify that the

15   officers as part of the totality of the

16   circumstances used appropriate force in shooting

17   their weapons 41 to 45 times at Mr. Rodarte,

18   correct?

19       A.   That's part of the facts that preceded

20   the shooting.  The response to the deadly threat

21   is the justification, not the fact that he

22   flipped someone off, but that is all factual and

23   it did happen at that moment.  And more than one

24   person saw it.  It was in more than one witness

25   statement.

Atkinson-Baker Court Reporters
www.depo.com

1    deadly threat.

2       Q.   Okay. But you're not in this case, none

3    of the opinions contained in your report 3650

4    that you intend to offer at trial pertain to the

5    length of time it takes an officer to fire a

6    weapon, correct?

7       A.   There is a time to start shooting and a

8    time to stop shooting and that is listed in my

9    report.

10      Q.   Let me ask you this.  When

11   Deputy Bonnet had his sights squared onto

12   Mr. Rodarte, how long was it going to take

13   Deputy Bonnet to pull the trigger that he was

14   holding on to when he made the decision to shoot?

15      A.   After he made the decision or while he

16   is making the decision?  There are different

17   increments of time.  The time it takes to depress

18   a trigger once the decision is made is about six

19   one-hundredths of a second.

20      Q.   So it takes him six one-hundredths of a

21   second to pull the trigger?

22      A.   Just to pull the trigger.  Now there is

23   a perception and a reaction time and the full

24   response time.

25      Q.   Do you believe you're qualified to

114

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    render an expert opinion on what
 2    Deputy Bonnet's response time is?
 3          A.   I do.
 4          Q.   You do?
 5          A.   I do.
 6          Q.   Have you ever tested him?
 7          A.   I've never tested Deputy Bonnet, no.
 8          Q.   Have you ever tested anybody from the
 9    San Bernardino Sheriffs Department on what their
10    reaction time is?
11          A.   No, but it's a human factor.  It's not
12    a deputy factor.
13          Q.   Tell me about your training in human
14    factors, then.  Are you a kinesiologist?
15          A.   No.
16          Q.   Are you a biomechanical engineer?
17          A.   No, I'm not.  Would you like to hear
18    about my training?
19          Q.   We will get there.
20          A.   Okay.
21          Q.   You're not a psychologist?
22          A.   No, I'm not.
23          Q.   You're not a doctor, correct?
24          A.   Correct.
25          Q.   Have you ever conducted a study, you,
```

115

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1    render an expert opinion on what
 2    Deputy Bonnet's response time is?
 3         A.   I do.
 4         Q.   You do?
 5         A.   I do.
 6         Q.   Have you ever tested him?
 7         A.   I've never tested Deputy Bonnet, no.
 8         Q.   Have you ever tested anybody from the
 9    San Bernardino Sheriffs Department on what their
10    reaction time is?
11         A.   No, but it's a human factor.  It's not
12    a deputy factor.
13         Q.   Tell me about your training in human
14    factors, then. Are you a kinesiologist?
15         A.   No.
16         Q.   Are you a biomechanical engineer?
17         A.   No, I'm not. Would you like to hear
18    about my training?
19         Q.   We will get there.
20         A.   Okay.
21         Q.   You're not a psychologist?
22         A.   No, I'm not.
23         Q.   You're not a doctor, correct?
24         A.   Correct.
25         Q.   Have you ever conducted a study, you,
```

115

James W. Borden
October 25, 2016

1        A.    The study is not there.  It's cited

2   there, though.

3             MR. PACHOWICZ: Did you produce it?

4             MS. POWELL:  No. We indicated earlier

5   that it was equally available to counsel.

6   BY MR. PACHOWICZ:

7        Q.    Where is it available?

8        A.    It's on the citation on the

9   Force Science website, and I believe it's in a

10  peer reviewed journal article as well.

11       Q.    Which peer review journal?

12       A.    You would have to look on the -- I

13  can't recall the name of it.

14       Q.    Who peer reviewed it?

15       A.    I can't recall the name of the journal.

16       Q.    What role did you play in the study?

17       A.    The study, I was working on the range.

18  I was in the Force Science Institute and setting

19  up the GoPro cameras and just collecting the

20  data.

21       Q.    Okay. Setting up the cameras.  So there

22  is video that was done of this study?

23       A.    Yes. That's how we determine the time

24  frames.

25       Q.    So have you produced any of the videos?

117

James W. Borden
October 25, 2016

1      A.    No, I haven't.   I didn't produce any of

2  the videos.

3      Q.    Why not?

4      A.    Because it wasn't my role.

5      Q.    Are they equally available to me?

6      A.    The study is available.

7      Q.    No. The videos of the study?

8      A.    No, I don't believe that the videos are

9  available.

10     Q.    Why not?

11     A.    I don't have any idea.   It's not my

12 role.

13     Q.    When you say you were there when the

14 study was conducted, were you there when one

15 hundred people or however many showed up and

16 pulled the trigger?

17     A.    Yes.   I was in the range when that was

18 going on.   That was at the gun range.

19     Q.    So you were at the gun range?

20     A.    Yes.   I was part of this staff that was

21 handling the study.

22     Q.    Who were the participants that were

23 pulling the trigger?

24     A.    Various deputies and officers from the

25 area of Virginia.

118

James W. Borden
October 25, 2016

1      Q.   Were they told the purpose of the

2    study?

3      A.   Yes.

4      Q.   What were they told the purpose of the

5    study was?

6      A.   To test the speed from the indexing

7    position to pull the trigger.

8      Q.   Were they told what the study was going

9    to be used for?

10     A.   Yes. For empirical data on the time to

11   pull the trigger.

12     Q.   You would agree that the time it takes

13   me to run one hundred yards is subjective,

14   correct?

15     A.   It could be, yes. I mean, the time that

16   it takes you to run one hundred yards is what it

17   is, but males in your age bracket with your level

18   of whatever, that's going to have to be a test

19   section.

20     Q.   I can run one hundred as fast or as

21   slow as I want, right?

22     A.   Yes.

23     Q.   And a guy can pull a trigger as fast or

24   as slow as he wants, right?

25     A.   Yes.

Atkinson-Baker Court Reporters
www.depo.com

1       Q.   So my question is, do you have any
2   information about how long it takes Deputy Bonnet
3   to pull a trigger?
4       A.   No. Just general information.
5       Q.   Do you have any information about how
6   long it took Sergeant Walker to pull a trigger?
7       A.   General information.
8       Q.   Any information Deputy Fortier?
9       A.   It's the same on all of them, just
10  general information.
11      Q.   Deputy Page and Deputy Casas?
12      A.   Yes.
13      Q.   No information about any of that,
14  correct?
15      A.   Just general information on how fast
16  you can pull a trigger. The average is on a
17  standard Glock is about a quarter of a second per
18  round fired.
19      Q.   Well, nobody in this case fired a
20  Glock, correct?
21      A.   No, they didn't. It's just an example.
22      Q.   So in your study did they use an
23  M4?
24      A.   No.  It wasn't any rifle shots for that
25  study. It's not the actual weapon that is getting

120

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1    1.4 or anything else, correct?
2        A.    No.   The only thing I have to go on is
3    the fact that the officers' rounds took 2.04
4    seconds to be fired and there were no
5    trajectories in any of the autopsy reports where
6    Mr. Rodarte was hit in anything but from front to
7    back through and through.
8            So I had to assume that in the time
9    that the rounds were fired in 2.04 seconds that
10   the rounds hit him in the front because he was
11   still facing them at that point.
12       Q.    Tell me about your qualifications to
13   determine the trajectory of the bullets that went
14   through Mr. Rodarte.
15       A.    Simply looking at the autopsy reports.
16   It's just facts that I gleaned from the report.
17       Q.    You're not an expert in trajectory of
18   bullets, are you?
19       A.    I can only read the reports.
20       Q.    So you're not an expert in trajectory
21   of bullets, correct?
22       A.    No, sir. I'm not.
23       Q.    So you can't testify in court about
24   having an expert opinion about the trajectory of
25   the bullets that went through him, correct?
```

125

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1          A.    I didn't comment on the trajectory of

2    the bullets. I commented on the report that

3    stated that all of the trajectory path went from

4    front to back.   I'm not claiming to be an expert.

5    I'm only claiming that that's what the report

6    states.

7               Sorry if I wasn't clear on that.

8          Q.    Well, they couldn't have all been front

9    to back, right?   I mean, that's just false, has

10   to be false?

11              MS. POWELL:  Argumentative, counsel.

12   Ask the question.

13              THE WITNESS: The report states that.   I

14   can't refute the report.   The report says what it

15   says.

16   BY MR. PACHOWICZ:

17         Q.    Well, come on.   The truck or the

18   BearCat, right?

19         A.    Yes.

20         Q.    There was a turret in the BearCat?

21         A.    Yes.

22         Q.    There was gentleman in the BearCat?

23         A.    Right.

24         Q.    In the turret with an M4, correct?

25         A.    Yes.

James W. Borden
October 25, 2016

```
 1    trajectories in the body based on the coroner's
 2    report.
 3          Q.   So your view is whether they shot 41,
 4    45 times, that's not an excessive use of force?
 5             MS. POWELL:  He's not rendering
 6    opinions about the use of force.
 7    BY MR. PACHOWICZ:
 8          Q.   Okay. So let's look at this for a
 9    second.  You have your report in front of you.
10    It is Exhibit No. 3650. Tell me what lines of
11    your report constitute the opinions that you
12    intend to offer in this case at trial.
13          A.   I believe it's under opinions, page 23.
14          Q.   Opinions, use of force, that page?
15    paragraph 32?
16          A.   Yes, sir.
17          Q.   Okay. Counsel just said that you're not
18    rendering opinions regarding use of force.   Is
19    that a true statement or is that -- this is from
20    counsel.   Is that a true statement or is that
21    false?
22          A.   My opinion is about the use of force.
23    It's about the shots fired.
24          Q.   She just said it's not.
25          A.   Okay. It is about the use of force.
```

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1        Q.    That's what I want to know because I'm

2    here and she just said it's not, and I can't tell

3    from your report.   Her statement on the record is

4    he's not rendering an opinion about use of force.

5    Is that true or false, Ms. Powell?

6             MS. POWELL:   That is not all of his

7    opinion.   His opinion takes into account whether

8    or not the force was reasonable within the

9    context of the human factors.

10             MR. PACHOWICZ: He is not testifying

11   about any opinion regarding tactics used by the

12   deputies, correct?

13             MS. POWELL:   He's not rendering

14   opinions solely based on tactics; only to the

15   extent that these tactics and that use of force

16   are coupled with human factors.

17             THE WITNESS: And it says it here at the

18   bottom --

19   BY MR. PACHOWICZ:

20        Q.    Wait a minute.   Before you go there.

21        A.    Okay.   I'm sorry.

22        Q.    Okay.   Because this is really

23   important.   Because I want to know what you're

24   going to say and that's what I have a right to

25   know.

129

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.    Right.
 2        Q.    So I now know because you have
 3   testified that you have no opinion regarding what
 4   tactics were or were not used by the team?
 5        A.    Right.
 6        Q.    We agree you are not going to provide
 7   an opinion in that regard?
 8        A.    That is correct.
 9        Q.    And I have Ms. Powell on the record
10   telling me that you are not rendering an opinion
11   regarding use of force, correct?
12        A.    No.
13              MS. POWELL:  No.
14              MS. PACHOWICZ: That's what you said.
15              MS. POWELL:  Let's correct the record.
16              MR. PACHOWICZ: Did you say it?
17              MS. POWELL:  Let's correct the record,
18   counsel. You were asking him solely about his use
19   of force.  What I'm saying is his opinions are
20   not strictly limited to use of force; only in the
21   context that it's coupled with human factors.
22              MR. PACHOWICZ: Is he going to testify
23   about that the use of force was excessive?
24              MS. POWELL:  No.
25              MR. PACHOWICZ: He is going to testify
```

130

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    that the use of force was reasonable?

2            MS. POWELL:  If you ask him that

3    question based on his report he can give you an

4    opinion.  His opinion is not limited to whether

5    an a vacuum the use of force is reasonable. There

6    is an -- expert that will give those opinions.

7            His opinion is coupled with the human

8    factors and whether or not the use of force

9    factors into the human factors that he reviewed

10   from his reports.

11           MR. PACHOWICZ: That makes no sense to

12   me.

13           MS. POWELL:  It does make sense,

14   counsel.

15   BY MR. PACHOWICZ:

16       Q.   Okay. Sir, which other reports besides

17   what you provided have you reviewed prior to

18   drafting your report which we have marked as

19   Exhibit No. 3650 that were prepared by an expert?

20       A.   I have not for this case.

21       Q.   Okay. Because counsel just said that

22   you were taking into account the opinion of other

23   use of force experts that were going to testify.

24           MS. POWELL:  No, I did not say that,

25   counsel.

131

James W. Borden
October 25, 2016

```
 1              THE WITNESS: That wasn't what was said.
 2    My opinions are I take into consideration police
 3    procedures and, yes, I do have an opinion on the
 4    use of force, the number of rounds fired and the
 5    reasonableness of the officers responding to a
 6    deadly threat.  And, yes, that being the use of
 7    force, I have an opinion on that.  So I will be
 8    giving my opinion on the use of force based on
 9    the number of rounds fired and the use of deadly
10    force in response to the deadly threat.
11              Let that be the corrected statement.
12              MR. PACHOWICZ: No.  You don't get to
13    decide what you're going to testify to.  She
14    does.
15              MS. POWELL:  That is a correct
16    statement.  That is a correct statement.  And if
17    I let counsel view that he doesn't have an
18    opinion about those things, that is not correct.
19              Counsel, let him give his opinions.
20    You're making it sound like that is his sole
21    purpose in reviewing this case.  What I'm trying
22    to get you to understand is he reviews it in the
23    context of the human factors and the human
24    element which is different from incorporating
25    tactics and policies and procedures.  It's a
```

James W. Borden
October 25, 2016

1    different analysis.

2             MR. PACHOWICZ: Okay.  This is the

3    issue.  You said he is not rendering an opinion

4    on use of force.  You have somebody else for

5    that, correct?

6             MS. POWELL:  Based on policies and

7    procedures, correct.

8             MR. PACHOWICZ: So that is where you

9    can't have ten experts come in and say I'm here

10   for use of force.  Hey, it was good use of force.

11   I'm here for use of force. It was good use of

12   force.

13            MS. POWELL:  Absolutely, counsel, but

14   they can all analyze the same set of

15   circumstances and use those circumstances to give

16   you that opinion and to base it on his

17   perspective in looking at those set of

18   circumstances giving his opinion with respect to

19   human factors.

20            MR. PACHOWICZ: So under what you just

21   said, you are going to have him come in and say

22   the use of force was reasonable in this case,

23   correct?

24            MS. POWELL:  He can give that opinion.

25            MR. PACHOWICZ: No. I don't care what he

133

1    can do.  The question is what are you as the

2    attorney going to ask him to do? Are you going to

3    ask him for his opinion on whether the use of

4    force was reasonable or not?

5             MS. POWELL:  No. We don't intend to

6    elicit just that opinion from him.

7             MR. PACHOWICZ: Not just that. I don't

8    care if you're going to ask him for one hundred

9    other opinions.  Are you going to ask him whether

10   in his opinion the use of force was reasonable,

11   yes or no?

12            MS. POWELL:  No.

13            MR. PACHOWICZ: And you're not going to

14   ask him whether or not in his opinion the use of

15   force was excessive or not excessive?

16            MS. POWELL:  No, we're not going to ask

17   him that.

18            MR. PACHOWICZ: And you're not going to

19   ask him whether or not the tactics employed by

20   the deputies that day were appropriate?

21            MS. POWELL:  That is correct, counsel.

22   BY MR. PACHOWICZ:

23       Q.   That takes me back to your report

24   because sometimes reports are written and it says

25   opinion one lays it out?

                                                   134

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1    court.
2              MS. POWELL:  He's offered a report.
3    You can ask him about his opinions.
4              MR. PACHOWICZ: No.
5              MS. POWELL: I'm not here to testify,
6    counsel.
7              MR. PACHOWICZ: No. His report does not
8    tell me what his opinions are.
9              MS. POWELL:  Then you can go through
10   all of it.
11             MR. PACHOWICZ: I am asking you if you
12   agree with that statement?
13             MS. POWELL:  I agree that his opinions
14   are incorporated into his report.
15   BY MR. PACHOWICZ:
16       Q.  Are there any other opinions that
17   you're going to seek to introduce at trial other
18   than those which I just stated, sir?
19       A.  The only opinions I seek to state are
20   in my report and I would be happy to go through
21   them with you.  I don't know how else to answer
22   that question.
23             I wrote this report based on the
24   officers' involvement in a deadly force situation
25   where a number of rounds were fired at a subject
```

140

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    that they perceived was a deadly threat.  And

2    during 2.04 seconds a number of rounds were fired

3    and my opinions are that that number of rounds

4    fired in that level of time based on the

5    circumstances they were faced with could be

6    reasonable.

7              I don't know how else to quantify that.

8    I'm going through my report here and this is the

9    information that is in the report.

10        Q.   I understand what is in the report.

11        A.   Okay.

12        Q.   I read the report.

13        A.   Okay.

14        Q.   I read it a number of times.

15        A.   Okay.

16        Q.   You do not list in your report what

17   opinions you will seek to testify to. You have a

18   paragraph that says opinions, use of force, and

19   that is, I believe, the one on page 23.

20             And your attorney says that you are not

21   providing testimony as an expert that the use of

22   force was appropriate.

23             MS. POWELL:  Solely --

24   BY MR. PACHOWICZ:

25        Q.   Excuse me for being confused.

141

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      A.   No, I gotcha. I understand.   I

2   understand.

3      Q.   But that's where we're at.

4      A.   Okay.

5      Q.   And I don't want to be here forever.

6      A.   I understand.

7      Q.   All right.   I want to know what you're

8   going to testify to and get to the bottom of

9   this?

10      A.   Okay.

11      Q.   You gave me the list.   Is there

12   anything other than the list you gave me?

13      A.   No.   The use of force employed by the

14   officers on that scene, based on the facts and

15   circumstances that they were faced with at that

16   moment, in my opinion appear to be reasonable

17   based on the timeline that is established and the

18   number of rounds fired in that timeline.

19          And that is the basis of my entire

20   report.

21      Q.   But you're not going to be asked

22   whether or not your opinion is that the shooting

23   was reasonable or unreasonable?

24          MS. POWELL:  Based upon human factors.

25          THE WITNESS: Based on those factors,

142

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    that's number of rounds fired in the timeline

2    that they were fired that we have a recording of,

3    that's the only existing ticker tape data that we

4    have to go on, the number of rounds fired by the

5    officers is reasonable in my opinion.

6            And so that as it applies to the use of

7    force, the use of force overall, my opinion is,

8    yes, that the use of force based on those factors

9    is reasonable.

10           I have not looked at another expert,

11   another use of force expert.  There are tactics

12   experts and there are police procedures experts.

13   There is no other person that I know of involved

14   in this that is going to specifically opine on

15   the use of force.

16           My opinion is based on those factors

17   and human limitations on perception reaction

18   times, the number of rounds fired in the short

19   amount of time that the rounds were fired.

20   BY MR. PACHOWICZ:

21       Q.   So whether it was 41 or 45, your

22   opinion is that the amounts were reasonable?

23       A.   Yes, sir.

24       Q.   At what point would it become

25   unreasonable?  If they fired 100 times, would it

143

James W. Borden
October 25, 2016

1    have no other source of information. I have to

2    believe the statements. What other information do

3    I have?

4        Q.   You just choose not to give it weight.

5        A.   There is no statement that I recall

6    that said that Mr. Rodarte was on his knees.  I

7    don't recall any statement that said that. That

8    statement that you're speaking of said that his

9    hands were up and there was one statement that

10   said that and that didn't have a contiguous

11   connection to any other statement.

12       Q.   Okay.

13       A.   And I'm not certain how I would fit

14   that into a report if it did.

15       Q.   Let me get this straight.  Your opinion

16   of what happened during that time is based on the

17   testimony of the deputies who were there?

18       A.   And the belt recording that depicts the

19   actual time and the coroner's report that shows

20   trajectory of the rounds not going through a body

21   that was laying on the ground.

22       Q.   So if I have the belt recordings and I

23   have the coroner's report, which you say you're

24   not a doctor or have no experience in trajectory,

25   and I have the officers, then you are providing

146

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    me nothing as to what happened during that

2    2.04 seconds that I don't have, correct?

3         A.    You have everything.

4         Q.    And you want to provide an opinion of

5    how the officers perceived the threat; is that

6    true?

7         A.    Yes, sir.

8         Q.    And you have not talked to the

9    officers, correct?

10        A.    Read their statements.

11        Q.    So you don't know other than what they

12   wrote in a report or have testified to in a

13   deposition how they perceived the threat,

14   correct?

15        A.    Other than that information, that is

16   correct.

17        Q.    And we have covered a large part so far

18   of your lack of knowledge about how long it takes

19   these particular officers to pull a trigger,

20   correct?

21        A.    Yes.  That is all simply from the belt

22   recording and listening to that belt recording

23   that is on a timeline, that is the only data that

24   we have.  The shots were being fired

25   simultaneously for 2.04 seconds as depicted in

147

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    questions about that.

2        A.    Okay.

3        Q.    Have you ever taken a psychology class?

4        A.    Not directly, no, sir, not a psychology

5    class, per se.   Sports psychology is part of the

6    main route of the Force Science Institute's

7    teachings, John Dickers' dictionets (phonetic)

8    talk about the inner workings and the psychology

9    behind sports anything where this is movement,

10   eye tracking, that type of thing.

11       Q.    Let me ask it another way.

12       A.    Okay.

13       Q.    Force Science, this business that we

14   talked about, is run by Mr. Lewinski, correct?

15       A.    Yes, sir.

16       Q.    Now, when I am asking questions about

17   your training experience, I want anything other

18   than what you got from Force Science.

19       A.    Yes, sir.

20       Q.    I will come back and learn what you

21   learned from Force Science later, but I want to

22   keep separate what you learned from somewhere

23   else.

24       A.    You mean standard police training?

25       Q.    Whatever you think I need to know.

150

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1    investigation.
2         Q.   And you didn't use it in this case?
3         A.   I did not.
4         Q.   You are not a psychologist or a
5    psychiatrist, and you told me your entire
6    educational career so far, correct?
7         A.   Yes.
8         Q.   You already provided that to me?
9         A.   High school, and I have engineering
10   training.  I was an engineer for the state of
11   Nevada as well, so I do have engineering but no
12   degree in engineering.
13        Q.   Do you have a license or a certificate
14   in engineering?
15        A.   No, sir. That was many many areas ago
16   in a different life.
17        Q.   What kind of engineering was that?
18        A.   Structural.
19        Q.   Did you ever have a license in
20   structural engineering?
21        A.   No, sir. I was certified in facets of
22   surveying and the engineering side of roadway
23   construction.  That's all.  It also is not
24   applicable to this.
25        Q.   So, is there anything outside of what
```

152

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
1          A.   No, not directly because I use that for
2     the department as well.
3          Q.   Now, have you ever testified in any
4     federal case involving human factors?
5          A.   No, sir. I have never testified in a
6     federal case, period.  This is my first.
7          Q.   Have you ever testified in a state
8     court proceeding regarding human factors as an
9     expert?
10         A.   No, sir, only in an arbitration.
11         Q.   Was that arbitration transcribed?
12         A.   I'm not sure of that if it was
13    transcribed or not.  It may have been.  I'm not
14    certain but those cases are listed in my
15    curriculum.
16         Q.   Did you keep a copy of your testimony?
17         A.   No, sir.
18         Q.   Did you keep what is the case number or
19    case name?
20         A.   It's in my CV.  There was one that was
21    Buechler.
22         Q.   Your CV is right -- you tell me.
23         A.   Buechler versus Brown was actually a
24    federal case that I did a report for but it got
25    summary judgment, so I never did testify.
```

                                                          156
                        James W. Borden
                        October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1   based on the knowledge that you have learned

2   through Force Science, correct?

3          MS. POWELL:   That is correct.   He's not

4   going to give an opinion as to how much he earns.

5   BY MR. PACHOWICZ:

6      Q.   From Force Science?

7      A.   From Force Science, correct.

8      Q.   And all of the knowledge and training

9   you have which would be the basis upon your

10   opinions you have received through Force Science,

11   correct?

12      A.   Most of it, yes.   My certifications and

13   my advanced certification has all been achieved

14   through the Force Science Institute which is

15   nationally recognized for that.

16      Q.   Nationally recognized by whom?

17      A.   Everyone that has an interest in it, I

18   guess.   I'm not --

19      Q.   Well, if it's nationally recognized, I

20   would like to know who nationally recognizes it.

21      A.   They teach all over the country to

22   every police department that requests their

23   presence.   So they are the, I guess the standard

24   for this information for human factors and human

25   behavioral science and the education of that and

159

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    how it applies to law enforcement to police.

2         Q.   According to the police departments?

3         A.   Yes, according to the police

4    departments.

5         Q.   No one else but police departments?

6         A.   No, I wouldn't say that.  They are the

7    subject of the much fodder on the Internet.  I

8    mean, they're a well known institute.

9         Q.   Yes, they are.

10        A.   Hated or disliked, either/or.

11        Q.   Back to the question, you said that

12   they were nationally recognized?

13        A.   They are.

14        Q.   By whom?

15        A.   By police departments in every state,

16   nationally.

17        Q.   They are not nationally recognized by

18   any non-police agency, correct?

19        A.   Attorney firms, non-police agency

20   attorney firms.  They're recognized by attorney

21   firms, yes.

22        Q.   So people like Ms. Powell recognize

23   them throughout the state as an individual they

24   can call to defend a police shooting?

25        A.   Not necessarily to defend a police

160

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1    finger on the trigger and point it in some
2    direction of somebody that wasn't in front of
3    him, correct? You have no idea how long that
4    would take?
5         A.    It can happen very rapidly, and when I
6    say very rapidly it can happen in a half a second
7    or less.   1,001 being one second, in half that
8    time a subject can present a threat and shoot a
9    weapon.
10        Q.    So Mr. Rodarte in your opinion could
11   have in a half a second reached into his poncho,
12   holding a beer in his left hand reached in his
13   poncho with his right hand, grabbed a gun,
14   grabbed on to the handle of the gun, grabbed and
15   put his finger into the poncho and then turned
16   the poncho and the gun that he was now holding on
17   to and fired that weapon in a half a second?
18        A.    Yes. Holding a beer and thrust it in
19   and raise your hand can absolutely happen in half
20   of a second.   Now, that is a conjecture because
21   we don't have video and we don't know, but, yes,
22   the potential is there.
23            It's a half of a second to three
24   quarters of a second at the longest, and that is
25   just not a lot of time.

196

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              THE WITNESS: Okay. I can --
 2              MS. POWELL:  Counsel, let's not be rude
 3   or we will end the deposition now.
 4              MR. PACHOWICZ: I'm not being rude.
 5   You made your objection.  I have had these
 6   debates with you all afternoon.
 7              MS. POWELL:  It's not a debate,
 8   counsel.
 9              MR. PACHOWICZ: You said he's answered
10   the question.  So he is stuck with the answer.
11              MS. POWELL:  He's not stuck with
12   anything.
13              THE WITNESS: If you would like me to
14   expound on that, I will.
15   BY MR. PACHOWICZ:
16      Q.   Did you take part in Mr. Lewinski's
17   2014 study?
18      A.   No, I did not.
19      Q.   So your entire knowledge is you read
20   that document?
21      A.   I read that document as part of my
22   advanced certification and I teach that
23   information now in the certification course in
24   the two-day course.
25      Q.   Now, did you write in your opinion --
```

200

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

1      A.   Yes, and that is -- that study has been

2  conducted because it's hard to find people that

3  will take part in a study where they are knocked

4  unconscious or killed to time their fall.

5            So that's off of existing data that is

6  out on You Tube or wherever that data may come

7  from and where an average is taken in the time

8  from a knockout punch or somebody who has been

9  shot takes time to fall, and on average it's 1.23

10 seconds.

11     Q.   Well, you would agree that this 1.23

12 average includes being knocked out by a punch?

13     A.   Yes.  Anything where --

14     Q.   Shot with a taser?

15     A.   No, not shot with a taser.  Anything

16 where you are knocked unconscious or killed,

17 those videos were used, and I'm not sure what the

18 videos are.

19     Q.   How many videos were used?

20     A.   I can't tell you that.  I don't know.

21     Q.   How many videos of a person being shot

22 were used?

23     A.   I don't know. I don't know any of the

24 numbers on that.

25     Q.   What was the definition of falling?

202

James W. Borden
October 25, 2016

Atkinson-Baker Court Reporters
www.depo.com

```
 1              CERTIFICATE OF REPORTER

 2

 3         I, the undersigned, a Certified Court

 4   Reporter, of the State of Nevada, do hereby

 5   certify:

 6              That the foregoing proceedings were

 7   taken before me at the time and place herein set

 8   forth; that any witnesses in the foregoing

 9   proceedings prior to testifying were duly sworn;

10   that a record of the proceedings was made by me

11   using machine shorthand which was thereafter

12   transcribed under my direction; that the

13   foregoing transcript is a true record of the

14   testimony given.

15              Further, before completion of the

16   proceedings, review of the transcript {X  } was

17   {  } was not requested.

18              I further certify I am neither

19   financially interested in the action nor a

20   relative or employee of any attorney or party to

21   this action.

22              IN WITNESS WHEREOF, I have this date
     subscribed my name.
23
     DATED: November 12, 2016
24
                    JULIE M. LEVER, RPR, CCR No.: 582
25
```

217

James W. Borden
October 25, 2016