1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

# EXHIBIT B

17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' DAUBERT MOTION RE: JAMES BORDEN

Case No. EDCV 15-00033-DTB

**5:15-EDVC-00033-DTB**

**(Estate of Enrique Carlos Rodarte et al. v. City of Victorville, et al.)**

**Incident Review, Associated File No. 900-46979**

**Date of incident:  January 12, 2014**

## CASE REVIEW & ANALYSIS
## EXPERT OPINION

**Prepared by: James W. Borden**

**September 26, 2016**

Manning & Kass, Ellrod, Ramierez, Trester LLP.

Attn: Eugene P. Ramirez

15th Floor at 801 Tower

801 Figueroa Street

Los Angeles, CA 90017-3012


Dear Mr. Ramirez:

      Thank you for the kind invitation and opportunity to review this case and provide an objective opinion.

      This review of Case **5:15-EDVC-00033-DTB**, a use of force incident, entails an analysis of the incident with a focus on an alleged excessive use of force.  The analysis is conducted using statements from the involved officers, witnesses, department policy and SOP's, including a review of the tactics, conditions and the environment the officer(s) involved were faced with during this event.

      All information found in this report is derived from statements, either written or transcribed or both, and/or information supplied to me by your office specifically for the purposes of this report.  All documents or any other relative information that has been used for the purpose of this report is listed below under "Items received."

      After you have reviewed this report, please do not hesitate to contact me with any questions or concerns you may have.


Items Received: File labeled **5:15-EDVC-00033-DTB**, All documents listed below

| 1 | Memo from Assistant D.A. Roth to Dep. D.A. Faherty re OIS Summary;  03/21/14 | COSB 00001 - COSB 00010 |
|---|---|---|
| 2 | SBCSD Incident Report re OIS of Enrique Rodarte by Det. Avila;  01/15/14 | COSB 00011 |
| 3 | SBCSD Incident Report re OIS of Enrique Rodarte by Dep. Kunzman;  01/12/14 | COSB 00012 |
| 4 | SBCSD Report re Property Release by Kunzman;  01/12/14 | COSB 00013 |
| 5 | SBCSD Detailed History Call Log;  01/12/14 | COSB 00014 – COSB 00026 |
| 6 | CLETS printout re: 1995 Chevy registered owner Reanna Hermosillo | COSB 00027 |
| 7 | DMV Photo Image of Enrique Rodarte | COSB 00028 |
| 8 | Abstract Warrant Search re: Enrique Rodarte;  01/12/14 | COSB 00029 |
| 9 | CLETS printout re: DMV record of Enrique Carlos Rodarte | COSB 00030 |
| 10 | SBCSD Report re Incident Briefing by Det. Hart;  01/17/14 | COSB 00177 - COSB 00179 |
| 11 | SBCSD Report re Walk-Through by Det. Hart;  01/17/14 | COSB 00180 |
| 12 | | |
| 13 | SBCSD Handwritten Notes *Redacted* | COSB 00031 – COSB 00032 |
| 14 | SBCSD Report re Call Out by Det. Avila;  01/14/14 | COSB 00033 – COSB 00034 |
| 15 | SBCSD Report Assignment by Det. Hart;  01/17/14 | COSB 00035 |
| 16 | SBCSD Report re Call Out by Det. Bachman;  01/14/14 | COSB 00036 - COSB 00038 |
| 17 | SBCSD Report re OIS Notification by Det. Hurtado;  01/16/14 | COSB 00039 |
| 18 | SBCSD Report re OIS Notification by Det. Zierdt;  02/18/14 | COSB 00040 |
| 19 | SBCSD Report re OIS Notification by Det. Davenport;  01/14/14 | COSB 00041 |
| 20 | SBCSD Report re Scene by Det. Avila;  01/14/14 | COSB 00042 - COSB 00056 |
| 21 | SBCSD Report re Interview of Victorville **Deputy Eric Rose** by Det. Hurtado;  01/16/14 | COSB 00057 – COSB 00060 |
| 22 | SBCSD Report re Interview of Victorville **Deputy Max Kunzman** by Det. Hart;  02/03/14 *Redacted* | COSB 00181 - COSB 00184 |
| 23 | SBCSD Report re Interview of Victorville **Deputy Floyd Stone** by Det. Davenport;  01/14/14 | COSB 00185 - COSB 00190 |
| 24 | SBCSD Report re Interview of Victorville **Deputy Travis Buell** by Det. Davenport;  01/14/14 | COSB 00191 - COSB 00197 |
| 25 | SBCSD Report re Interview of Victorville **Deputy Pedro Ortiz** by Det. Wijnhamer;  01/14/14 *Redacted* | COSB 00198 – COSB 00200 |
| 26 | SBCSD Report re Interview of Victorville **Deputy Antonio Juarez** by Det. Wijnhamer;  01/14/14 *Redacted* | COSB 00201 – COSB 00204 |
| 27 | SBCSD Report re Interview of Chino Hills **Det. Joe Catalano** by Det. Wijnhamer;  01/14/14 *Redacted* | COSB 00205 – COSB 00207 |
| 28 | SBCSD Report re Interview of Victorville **Det. Brian Lopez** by Det. Bachman;  01/16/14 *Redacted* | COSB 00208 – COSB 00212 |
| 29 | SBCSD Report re Interview of Victorville **Det. Brad Bonnet** by Det. Bachman;  01/16/14 *Redacted* | COSB 00213 – COSB 00218 |
| 30 | SBCSD Report re Interview of SED **Deputy David Page** by Det. Hart;  02/03/14 *Redacted* | COSB 00219 – COSB 00222 |
| 31 | SBCSD Report re Interview of SED **Deputy Jason Fortier** by Det. Hart;  02/03/14 | COSB 00223 – |

|    | | |
|----|---------------------------------------------------------------------------------------|------------------------------|
|    | *Redacted* | COSB 00227 |
| 32 | SBCSD Report re Interview of SED **Deputy Paul Casas** by Wijnhamer;  01/14/14 <br> *Redacted* | COSB 00228 – <br> COSB 00230 |
| 33 | SBCSD Report re Interview of SED **Sgt. John Walker** by Det. Bachman;  01/22/14 <br><br> *Redacted* | COSB 00231 – <br> COSB 00236 |
| 34 | SBCSD Report re Interview of **Reserve Deputy Mike Register** by Det. Hart; <br> 02/03/14 <br> *Redacted* | COSB 00237 – <br> COSB 00240 |
| 35 | SBCSD Report re Interview of **Det. Gregory Winegar** by Det. Zierdt;  02/18/14 <br> *Redacted* | COSB 00241 – <br> COSB 00245 |
| 36 | SBCSD Report re Interview of SED **Sgt. Tim Nichols** by Det. Hart;  02/03/14 <br> *Redacted* | COSB 00246 – <br> COSB 00249 |
| 37 | SBCSD Report re Interview of SED **Deputy Farris Short** by Det. Bachman; <br> 01/15/14 <br> *Redacted* | COSB 00250 – <br> COSB 00254 |
| 38 | SBCSD Report re Interview of SED **Deputy Gregg Carpenter** by Det. Avila; <br> 01/15/14 <br> *Redacted* | COSB 00255 – <br> COSB 00258 |
| 39 | SBCSD Report re Interview of SED **Det. Robert Arrieta** by Det. Bachman; <br> 01/15/14 <br> *Redacted* | COSB 00259 – <br> COSB 00265 |
| 40 | SBCSD Report re Assignment by Det. Collins;  02/24/14 | COSB 00061 – <br> COSB 00062 |
| 41 | SBCSD Report re SWAT by Jackson;  02/24/14 | COSB 00063 |
| 42 | SBCSD Supplemental report re: Assignment by Sgt. Charbonneau;  02/14/14 | COSB 00064 - <br> COSB 00065 |
| 43 | SBCSD Supplemental report re: Assignment by Schmiedel;  02/24/14 | COSB 00066 - <br> COSB 00068 |
| 44 | SBCSD Report re Interview of SED **Deputy Cesar Alban** by Det. Avila;  01/15/14 <br> *Redacted* | COSB 00266 – <br> COSB 00267 |
| 45 | SBCSD Report re Interview of SED **Deputy Micholas Tollefson** by Det. <br> Wijnhamer;  02/11/14 <br> *Redacted* | COSB 00268 – <br> COSB 00270 |
| 46 | SBCSD Report re Interview of SWAT **Det. Joshua Conley** by Det. Bachman; <br> 01/16/14 <br> *Redacted* | COSB 00271 – <br> COSB 00275 |
| 47 | SBCSD Report re Interview of SED **Det. Jeremy Dean** by Det. Bachman;  01/15/14 <br> *Redacted* | COSB 00276 – <br> COSB 00281 |
| 48 | SBCSD Report re Interview of SED **Det. Sean Struebing** by Det. Bachman; <br> 02/04/14 <br> *Redacted* | COSB 00282 – <br> COSB 00287 |
| 49 | SBCSD Report re Interview of **Det. Kelly Craig** by Det. Wijnhamer;  02/11/14 <br> *Redacted* | COSB 00288 – <br> COSB 00290 |
| 50 | SBCSD Report re Interview of Victorville **Deputy Omar Lastra** by Det. <br> Wijnhamer;  01/16/14 <br> *Redacted* | COSB 00291 – <br> COSB 00293 |
| 51 | SBCSD Report re: Assignment by Det. Ades;  02/14/14 | COSB 00069 |
| 52 | SBCSD Report re: Assignment by Det. LuBrant;  02/19/14 | COSB 00070 – <br> COSB 00071 |
| 53 | SBCSD Report re Assignment by Det. Sandlin;  02/14/14 | COSB 00072 |
| 54 | SBCSD Report re Search Warrant by Carpenter;  01/31/14 | COSB 00073 |
| 55 | SBCSD Report re Incident by White;  01/28/14 | COSB 00074 |
| 56 | SBCSD Report re Interview of Paramedic **Curtis Malloy** by Det. Bachman; <br> 01/14/14 | COSB 00075 – <br> COSB 00076 |
| 57 | SBCSD Report re Interview of **Tamara Wright** by Det. Bachman;  01/16/14 | COSB 00294 – |

| | | |
|---|---|---|
| | *Redacted* | COSB 00295 |
| 58 | SBCSD Report re Interview of brother **Michael Rodarte** by Det. Davenport; 01/14/14<br>*Redacted* | COSB 00296 – COSB 00300 |
| 59 | SBCSD Report re Interview of father **Luis Rodarte** by Det. Bachman; 01/15/14<br>*Redacted* | COSB 00301 – COSB 00302 |
| 60 | SBCSD Report re Interview of brother **Mario Rodarte** by Det. Wijnhamer; 02/18/14<br>*Redacted* | COSB 00303 – COSB 00305 |
| 61 | SBCSD Report re Interview of aunt **Georgia Ann Tovar** by Det. Zierdt; 02/18/14<br>*Redacted* | COSB 00306 |
| 62 | SBCSD Report re Interview of **Janai Jones** by Det. Wijnhamer; 02/12/14<br>*Redacted* | COSB 00307 |
| 63 | SBCSD Report re Neighborhood Check by Det. Hurtado; 01/16/14<br>*Redacted* | COSB 00308 – COSB 00311 |
| 64 | SBCSD Report re Weapon Exchange by Det. Davenport; 01/14/13 | COSB 00077 - COSB 00085 |
| 65 | SBCSD Report re Autopsy by Det. Hart; 01/14/14 | COSB 00086 - COSB 00124 |
| 66 | SBCSD Lab Report by Bonar; 01/16/14 | COSB 00125 – COSB 00128 |
| 67 | SBCSD Lab Report re Autopsy Evidence by CSI Martinez; 02/05/14 | COSB 00129 – COSB 00133 |
| 68 | SBCSD Lab Report re Blood Processing by CSI Partridge; 03/20/14 | COSB 00134 - COSB 00135 |
| 69 | SBCSD Lab Report re Trajectory by CSI CSI Radeleff; 02/05/14 | COSB 00136 – COSB 00152 |
| 70 | SBCSD Evidence/Property Report by Radeleff; 01/13/14 | COSB 00153 - COSB 00157 |
| 71 | SBCSD Evidence/Property Report by Schnell; 01/13/14 | COSB 00158 – COSB 00165 |
| 72 | SBCSD Evidence/Property Report by Martinez; 01/23/14 | COSB 00166 - COSB 00170 |
| 73 | SBCSD Evidence/Property Report by Zierdt; 02/18/14 | COSB 00171 |
| 74 | SBCSD Lab Report re Crime Scene by CSI Schnell; 01/28/14 | COSB 00172 - COSB 00176 |
| 75 | SBCSD Report re Interview of **Deputy Carlos Mejia** by Det. Bachman; 03/19/14<br>*Redacted* | COSB 00312 – COSB 00314 |
| 76 | Belt Recording for **David Page** | COSB 00429 & COSB 00348 |
| 77 | Belt Recording for **Eric Rose** | COSB 00429 & COSB 00348 |
| 78 | Belt Recording for **Joe Catalano** | COSB 00429 & COSB 00348 |
| 79 | Belt Recording for **Kelly Craig** | COSB 00429 & COSB 00348 |
| 80 | Belt Recording for **Omar Lastra** | COSB 00429 & COSB 00348 |
| 81 | Belt Recording for **Det. Sean Struebing** | COSB 00429 & COSB 00348 |
| 82 | Belt Recording for **Travis Buell** | COSB 00429 & COSB 00348 |
| 83 | Belt Recording for **Deputy Paul Casas** | COSB 00429 & COSB 00348 |
| 84 | Belt Recording for **Unidentified** | COSB 00429 & COSB 00348 |
| 85 | Belt Recording for **Max Kunzman** | COSB 00348 |
| 86 | Belt Recording for **Gregg Carpenter** | COSB 00429 & |
| 87 | Belt Recording for **Nicholas Tollefson** | COSB 00348 |

C.I.R. (Critical Incident Review) 3484 E. Saddle Avenue, Las Vegas NV 89121

| 88 | Belt Recording for **Pedro Ortiz** | COSB 00429 & |
|---|---|---|
| 89 | 9-1-1 Audio | COSB 00429 & COSB 00348 |
| 90 | Audio Interviews | COSB 00429 & COSB 00348 |
| 91 | Autopsy photos 1 (recovered items from the scene) | COSB 00429 & COSB 00348 |
| 92 | Autopsy photos 2 | COSB 00429 & COSB 00348 |
| 93 | Enrique Rodarte SBCR Autopsy photos 1st part | COSB 00429 & COSB 00348 |
| 94 | Enrique Rodarte SBCR Autopsy photos 2nd part | COSB 00429 & COSB 00348 |
| | Rodarte scene photos | COSB 00429 & COSB 00348 |
| 95 | Aerial photos | COSB 00429 & COSB 00348 |
| 96 | Photo Evidence Process 2 | COSB 00429 & COSB 00348 |
| 97 | Scene Photos | COSB 00429 & COSB 00348 |
| 98 | Scene Photos disc 2 | COSB 00429 & COSB 00348 |
| 99 | Suspect Gun Dep.s Aerial | COSB 00429 & COSB 00348 |
| 100 | TAC CAT | COSB 00429 & COSB 00348 |
| 101 | LEICA Pack and Go | COSB 00429 & COSB 00348 |
| 102 | Birth Certificate for Benjamin Isaiah Rodarte | *-PRODUCED BY PLAINTIFF* |
| 103 | Birth Certificate for Carlos Enrique Luis Rodarte | *-PRODUCED BY PLAINTIFF* |
| 104 | Birth Certificate for Jonathan Isac Hermosillo | *-PRODUCED BY PLAINTIFF* |
| 105 | Birth Certificate for Daniel Ruben Rodarte | *-PRODUCED BY PLAINTIFF* |
| 106 | Certificate of Death for Enrique Carlos Rodarte;  01/12/2014 | *-PRODUCED BY PLAINTIFF* |
| 107 | Article A man killed after a standoff by Daily Press | *-PRODUCED BY PLAINTIFF* |
| 108 | Article Deputies Fatally Shoot Man in Victorville After Four-Hour Standoff by San Bernardino Sun | *-PRODUCED BY PLAINTIFF* |
| 109 | Article Deputies Fatally Shoot Man in Victorville After Four-Hour Standoff by Inland Valley Daily Bulletin | *-PRODUCED BY PLAINTIFF* |
| 110 | Article Deputies slay alleged 'man with a gun' by Inland News Today | *-PRODUCED BY PLAINTIFF* |
| 111 | Article Man Shot by Deputies Identified by Daily Press | *-PRODUCED BY PLAINTIFF* |
| 112 | Article Man Killed during Standoff by Daily Press | *-PRODUCED BY PLAINTIFF* |
| 113 | Article Standoff with Authorities Ends Early Sunday Morning in Fatal Shooting by wordpress.com | *-PRODUCED BY PLAINTIFF* |
| 114 | Victorville Standoff Ends in Fatal Deputy Shooting by abc7 | *-PRODUCED BY PLAINTIFF* |
| 115 | Article Victorville Man killed in gun battle standoff with police ID'd | *-PRODUCED BY PLAINTIFF* |
| 116 | Article Victorville Suspect fatally shot after 4-hour standoff | *-PRODUCED BY PLAINTIFF* |
| 117 | Article Suspect dead after police standoff by daily press *-PRODUCED BY PLAINTIFF* | *-PRODUCED BY PLAINTIFF* |

C.I.R. (Critical Incident Review) 3484 E. Saddle Avenue, Las Vegas NV 89121

| | | |
|---|---|---|
| 118 | Horizon Memorial Services Funeral Agreement | *-PRODUCED BY PLAINTIFF* |
| 119 | Horizon Memorial Services Invoice | *-PRODUCED BY PLAINTIFF* |
| 120 | Receipts from Barstow Cemetery Horizon Memorial | *-PRODUCED BY PLAINTIFF* |
| 121 | State of California Benefits Identification Card – Enrique Rodarte | *-PRODUCED BY PLAINTIFF* |
| 122 | State of California Benefits Identification Card – Daniel Rodarte | *-PRODUCED BY PLAINTIFF* |
| 123 | State of California Benefits Identification Card – Benjamin Rodarte | *-PRODUCED BY PLAINTIFF* |
| 124 | SSN Card for Enrique Rodarte | *-PRODUCED BY PLAINTIFF* |
| 125 | SSN Card for Benjamin Rodarte | *-PRODUCED BY PLAINTIFF* |
| 126 | SSN Card for Carlos Enrique Rodarte | *-PRODUCED BY PLAINTIFF* |
| 127 | SSN Card for Daniel Rodarte | *-PRODUCED BY PLAINTIFF* |
| 128 | SSN Card for Jonathan Hermosillo | *-PRODUCED BY PLAINTIFF* |
| 129 | Tribal Membership Card for Enrique Rodarte | *-PRODUCED BY PLAINTIFF* |
| 130 | Walmart Identification Card for Enrique Rodarte | *-PRODUCED BY PLAINTIFF* |
| 131 | IEHP Medical Card for Jonathan Hermosillo | *-PRODUCED BY PLAINTIFF* |
| 132 | IEHP Medical Card for Carlos Rodarte | *-PRODUCED BY PLAINTIFF* |
| 133 | IEHP Medical Card for Benjamin Rodarte | *-PRODUCED BY PLAINTIFF* |
| 134 | IEHP Medical Card for Carlos Rodarte | *-PRODUCED BY PLAINTIFF* |
| 135 | Photos of Family | *-PRODUCED BY PLAINTIFF* |
| 136 | Photos from Scene | *-PRODUCED BY PLAINTIFF* |
| 137 | Video from Cell Phone of 16 video clips of Standoff | *-PRODUCED BY PLAINTIFF* |
| 138 | Plaintiff BIR RRFP1 | N/A |
| 139 | Plaintiff BIR RRFP2 | N/A |
| 140 | Plaintiff BIR RSROG1 | N/A |
| 141 | Plaintiff CELR RRFP1 | N/A |
| 142 | Plaintiff CELR RRFP2 | N/A |
| 143 | Plaintiff CELR RSROG1 | N/A |
| 144 | Plaintiff JIH RROG1 | N/A |
| 145 | Plaintiff JIH RRFP2 | N/A |
| 146 | Plaintiff JIH RRFP1 | N/A |
| 147 | Plaintiff DRR RSROG1 | N/A |
| 148 | Plaintiff DRR RRFP2 | N/A |
| 149 | Plaintiff DRR RRFP1 | N/A |
| 150 | Defendant RRFP1 | N/A |
| 151 | Defendant RRFP1. Supp.001 | N/A |
| 152 | Defendant RRFP2 | N/A |

C.I.R. (Critical Incident Review) 3484 E. Saddle Avenue, Las Vegas NV 89121          7

| 153 | Defendant RRFP3 | N/A |
| 154 | Defendant RRFP4 | N/A |
| 155 | Defendant RRFP5 | N/A |
| 156 | Defendant RRFP6 | N/A |
| 157 | Defendant RRFP6. Supp.001 | N/A |
| 158 | Defendant RRFP7 | N/A |
| 159 | Defendant RRFP8 | N/A |
| 160 | Defendant RRFP8. Supp.001 | N/A |
| 161 | Defendant RRFP9 | N/A |
| 162 | Defendant RRFP9. Supp.001 | N/A |
| 163 | Defendant RRFP10 | N/A |
| 164 | Defendant RRFP11 | N/A |
| 165 | Defendant RRFP12 | N/A |
| 166 | Defendant RRFP12. Supp.001 | N/A |
| 167 | Defendant RRFP13 | N/A |
| 168 | Defendant RRFP13. Supp.001 | N/A |
| 169 | Defendant RRFP14 | N/A |
| 170 | Defendant RRFP15 | N/A |
| 171 | Defendant RRFP16 | N/A |
| 172 | Defendant RRFP17 | N/A |
| 173 | Defendant RRFP17.Supp.001 | N/A |
| 174 | Defendant RRFP18 | N/A |
| 175 | Defendant RRFP19 | N/A |
| 176 | Defendant RRFP20 | N/A |
| 177 | Defendant RRFP20. Supp.001 | N/A |
| 178 | Defendant RRFP21 | N/A |
| 179 | Defendant RRFP22 | N/A |
| 180 | Defendant RRFP23 | N/A |
| 181 | Defendant RRFP24 | N/A |
| 182 | Defendant RRFP25 | N/A |
| 183 | Defendant RRFP26 | N/A |
| 184 | Defendant RRFP26. Supp.001 | N/A |
| 185 | Defendant RRFP27 | N/A |
| 186 | Defendant RRFP28 | N/A |
| 187 | Defendant RRFP29 | N/A |
| 188 | Defendant RRFP29. Supp.001 | N/A |
| 189 | Defendant RRFP30 | N/A |
| 190 | Defendant RRFP31 | N/A |
| 191 | Defendant RSROG1 Amended to BIR | N/A |
| 192 | Defendant RSROG1 Amended to CELR | N/A |
| 193 | Defendant RSROG1 to BIR | N/A |
| 194 | Defendant RSROG1 to CELR | N/A |
| 195 | Defendant RSROG2 Amended to CELR | N/A |
| 196 | Defendant RSRogs1-C.E.L.R. Amended Responses | N/A |
| 197 | Defendant's Initial Disclosures | N/A |

C.I.R. (Critical Incident Review) 3484 E. Saddle Avenue, Las Vegas NV 89121

8

| 198 | Plaintiff's Initial Disclosures | N/A |
|-----|--------------------------------|-----|
| 199 | Policy 3.166 re Pursuit | COSB 00324-COSB 00337 |
| 200 | Policy 3.640 re OIS | COSB 00338-COSB 00343 |
| 201 | Policy 5.135 re Records Chain of Custody | COSB 00344 |
| 202 | Policy 3.218 re Barricade & Warrants | COSB 00345 |
| 203 | Policy 3.108 re On-Call Procedures | COSB 00346-COSB 00347 |
| 204 | Transcription of Interview of **Craig, Kelly** by Det Wijnhamer;  01/15/14 | COSB 00539-COSB 00571 |
| 205 | Transcription of Interview of **Georgia Tovar** by Det Zierdt | COSB 00572-COSB 00630 |
| 206 | Transcription of Interview of **Greg Winegar** by Det Zierdt;  01/12/14 | COSB 00631-COSB 00735 |
| 207 | Transcription of Interview of **Janai Jones** by Det Wijnhamer;  01/12/14 | COSB 00736-COSB 00768 |
| 208 | Transcription of Interview of **Jason Fortier** by Det Hart;  01/12/14 | COSB 00769-COSB 00808 |
| 209 | Transcription of Interview of **Joe Catalano** by Det Wijnhamer;  01/12/14 | COSB 00809-COSB 00846 |
| 210 | Transcription of Interview of **John Walker** by Det Hurtado;  01/12/14 | COSB 00847-COSB 00884 |
| 211 | Transcription of Interview of **Mario Rodarte** by Det Wijnhamer;  01/12/14 | COSB 00885-COSB 00941 |
| 212 | Transcription of Interview of **Mike Register** by Det Hart;  01/12/14 | COSB 00942-COSB 00974 |
| 213 | Transcription of Interview of **Nicholas Tollefson** by Det Wijhamer;  01/15/14 | COSB 00975-COSB 01015 |
| 214 | Transcription of Interview of **Omar Lastra** by Det Wijnhamer;  01/15/14 | COSB 01016-COSB 01055 |
| 215 | Transcription of Interview of **Paul Casas** by Det Wijnhamer;  01/12/14 | COSB 01056-COSB 01116 |
| 216 | Transcription of Interview of **Tim Nichols** by Det Hart;  01/12/14 | COSB 01117-COSB 01150 |
| 217 | Transcription of Interviews with Neighbors by Det Hurtado | COSB 01151-COSB 01191 |
| 218 | Transcription of Interview of **David Page** by Det Hart;  01/12/14 | COSB 01192-COSB 01236 |
| 219 | Transcription of Interview of **Eric Rose** by Det Hurtado;  01/12/14 | COSB 01237-COSB 01280 |
| 220 | Transcription of Interview of **Max Kunzman** by Det Hart;  01/12/14 | COSB 01281-COSB 01340 |
| 221 | Transcription of Audio Interview of **Antonio Juarez** by Det. Wijnhamer;  01/12/14 | COSB 01341-COSB 01394 |
| 222 | Transcription of Audio Interview of **Brad Bonnet** by Det. Hurtado;  01/12/14 | COSB 01395-COSB 01441 |
| 223 | Transcription of Audio Belt Recording **David Page**;  01/12/14 | COSB 01442-COSB 01489 |
| 224 | Transcription of Audio Belt Recording **Deputy Buell**;  01/12/14 | COSB 01490-COSB 01538 |
| 225 | Transcription of Audio Belt Recording **Eric Rose**;  01/12/14 | COSB 01539-COSB 01569 |
| 226 | Transcription of Audio Belt Recording from **Nick Tollefson**;  01/12/14 | COSB 01570-COSB 01592 |
| 227 | Transcription of Audio Belt Recording from **Sean Struebing**;  01/12/14 | COSB 01593-COSB 01630 |
| 228 | Transcription of Audio Belt Recording **Greg Carpenter**;  01/12/14 | COSB 01631-COSB 01662 |
| 229 | Transcription of Audio Belt Recording **Joe Catalano** Track 1;  01/12/14 | COSB 01663- |

C.I.R. (Critical Incident Review) 3484 E. Saddle Avenue, Las Vegas NV 89121                    9

| | | |
|---|---|---|
| 230 | Transcription of Audio Belt Recording Joe Catalano Track 2;  01/12/14 | COSB 01670 |
| 231 | Transcription of Audio Belt Recording Max Kunzman;  01/12/14 | COSB 01671-COSB 01711 |
| 232 | Transcription of Audio Belt Recording Omar Lastra;  01/12/14 | COSB 01712-COSB 01769 |
| 233 | Transcription of Audio Belt Recording Paul Casas;  01/12/14 | COSB 01770-COSB 01790 |
| 234 | Transcription of Audio Belt Recording Pedro Ortiz Track 1;  01/12/14 | COSB 01791-COSB 01858 |
| 235 | Transcription of Audio Belt Recording Pedro Ortiz Track 2;  01/12/14 | COSB 01859-COSB 01888 |
| 236 | Transcription of Audio Belt Recording Track 1;  01/12/14 | COSB 01889-COSB 02004 |
| 237 | Transcription of Audio Belt Recording Track 2;  01/12/14 | COSB 02005-COSB 02050 |
| 238 | Transcription of Audio Interviews with Barbara Fearence by Det. Hurtado | COSB 02051-COSB 02077 |
| 239 | Transcription of Audio Interviews with Marisela Lemos by Det. Hurtado | COSB 02078-COSB 02092 |
| 240 | Transcription of Audio Interviews with Raymond Lewis by Det. Hurtado | COSB 02093-COSB 02110 |
| 241 | Transcription of Audio Interviews with Trisha Coleman by Det. Hurtado | COSB 02111-COSB 02149 |
| 242 | Transcription of Audio Interviews with Yolanda Torres and Desiree Gonzales by Det. Hurtado | COSB 02150-COSB 02156 |
| 243 | Training Records for Deputy John Walker | COSB 02157-COSB 02189 |
| 244 | Training Records for Det. Brad Bonnet | COSB 00498-COSB 00506 |
| 245 | Training Records for Deputy Paul Casas | COSB 00507-COSB 00514 |
| 246 | Training Records for Deputy Jason Fortier | COSB 00515-COSB 00524 |
| 247 | Training Records for Deputy David Page | COSB 00525-COSB 00532 |
| 248 | Policy 3.166 re Pursuit | COSB 00533-COSB 00538 |
| 249 | Policy 3.640 re OIS | COSB 00324-COSB 00337 |
| 250 | COSB Policy 3.628 Less Lethal Force | COSB 00338-COSB 00343 |
| 251 | D's RRFP 32 | COSB 02190-COSB 02191 |
| 252 | D's RRFP 34 | N/A |
| 253 | Deposition Transcript of  Sgt. Brad Bonnet taken 03/31/16 | N/A |
| 254 | Deposition Transcript of  Sgt. Greg Winegar taken 03/30/16 | N/A |
| 255 | Deposition Transcript of  Det. Jason Fortier taken 04/01/16 | N/A |
| 256 | Deposition Transcript of  Det. Max Kunzman taken 03/30/16 | N/A |
| 257 | Deposition Transcript of  Deputy Paul Casas taken 03/31/16 | N/A |

1                  Estate of Enrique Carlos Rodarte et al.

2                             v.

3                    City of Victorville, et al.

4             No. 5:15-EDVC-00033-DTB  January 2014

5

6                  **Expert Report of James Borden**

7 **Name of Expert:** James W. Borden

8 **Area of Expertise:** Law Enforcement, Use of force, Human Factors, Video

9 Analysis

10 **Case Type:** Civil Rights & Constitutional Law

11 **Jurisdiction:** City of Victorville, CA San Bernardino County

12

13 **Representing:** Defendants

14

15 *Qualifications*

16

17       1.      My Name is James (Jamie) Borden.  I have been an officer

18 since 1997, and I am actively involved in review & training of police

19 practices and law enforcement policies. I am currently active with the

20 Henderson Police Department. I am currently the senior officer in the Use-

21 of-Force Training and Analysis Unit for the Henderson Police Department. I

22 was instrumental in the development of that position and subsequent unit,

23 which established the Use-of-Force Training and Analysis Unit as a single

24 point of contact for the department in use-of-force and critical incidents for

25 the purpose of investigation, review and analysis.

26

2.      I am currently one of two full-time Use-of-Force Instructors for my department, responsible for all in-service Use-of-Force and associated training for police officers, corrections officers, and the department's Citizens Academy. I am also the primary Use of Force Instructor for the Southern Desert Regional Police Academy (S.D.R.P.A.) This is a multi-jurisdictional academy in Clark County and is a Nevada Police Officers Standards of Training (P.O.S.T.) certified entity.

3.      I am currently involved in all management and oversight of Use-of-Force with such tasks as identification of trends in use-of-force in our department, the statistical analysis of use-of-force through the department's reporting, and accountability software and reporting to the Commission on Accreditation for Law Enforcement Agencies (C.A.L.E.A.)

4.      My training, experience, lesson plan development, instruction and lecturing on the subject of use-of-force and seizure of persons is derived from case law from the Ninth Circuit Court of Appeals and the United States Supreme Court regarding use of force, with perpetual study and review of all case law decisions.

5.      In 2012, I received the Force Science Analyst Certification from the Force Science Institute, which is the leading law enforcement research institute, studying the science of human dynamics behind force encounters.

6.      In 2013, I was chosen to pilot the *Advanced Force Science Analyst* course with the Force Science Institute and Dr. Bill Lewinski. In

1   August of 2013, after a 400 hour focused study in human factors and human

2   behavioral science, I received the first Advanced Force Science Analyst

3   Certification internationally.

4

5       7.    In 2013, I joined the staff at the Force Science Institute as an

6   instructor.  Since 2013, I have been instructing and lecturing on scientific

7   studies conducted by the Force Science Institute and others, on human

8   factors and human behaviors as those elements apply to officers involved in

9   critical incidents.  I am currently a Force Science staff instructor for the five-

10  day Force Science Analyst Certification, the two-day focused course of

11  instruction and the four-hour modified Introduction to Force Science classes.

12  I have also been directly involved in studies conducted by the Force Science

13  Institute as a test subject and as a consultant, including gathering empirical

14  data for use in peer reviewed journal articles.

15

16      8.    Since 2012, I have been and continue to be responsible for the

17  review, analysis and consultation of use-of-force reporting for members of

18  the police department I am active in, for police officers and corrections

19  officers.

20

21      9.    I have extensive experience in police patrol and as a training

22  officer and instructor. I am also a certified Taser Instructor, Defensive

23  Tactics instructor, Baton instructor, and a certified Firearms Instructor.

24

25      10.   I have been in the following specialized assignments for the

26  Henderson Police Department: Field Training Officer, The Training Bureau,

27  Narcotics Division, and I am currently the lead officer in the Use of Force

1  Training and Analysis Unit. I have an in-depth background in analysis of
2  human factors and human behavior; investigating, reviewing and analyzing
3  officer involved shootings and critical incidents through video analysis; and
4  on scene investigation is an integral part of my current position.  My training
5  and background have given me first-hand knowledge and application
6  experience and the objective basis to review officers' actions in the time
7  compressed decisions involved in the use of non-deadly and deadly force.
8
9       11.    I am responsible for periodic reviews and updates of my
10  department's Use-of-Force Policy and any other policy that is connected to
11  use-of-force and the associated police procedure.
12
13       12.    Since 2013, I have instructed and/or lectured on Use-of-Force
14  and human factors nation wide, including the FBI Academy Associates, Law
15  Enforcement Executive Development seminars (LEEDS) and multiple
16  jurisdictions nationwide including state police, municipalities, sheriff's
17  departments and attorneys.
18
19       13.    I have works published in the Las Vegas Police Protective
20  Association's Magazine, "Vegas Beat", and the Daigle Law Group (DLG)
21  with an article titled "Policy Matters" May 2016.
22  http://digital.911media.com/i/678564-may-june-2016.  There is a complete
23  list of my publications, lectures and instruction on my Curriculum Vitae, as
24  well as previous and current cases I am involved in as an expert or
25  consultant.
26
27

1    *Summary of Facts*

2        14.    This is a summary of the facts on which my opinions are based.

3    This summary of facts is based off of witness statements, written, recorded

4    and transcribed. All documents referred to in the "items received" have been

5    reviewed.  The facts stated in this summary are relevant to the issue of mind-

6    set, based on pre existing information received in the initial dispatch, and

7    subsequent decision-making, in a highly critical, time compressed setting.

8    These decisions implicating life and death of involved suspects, officers and

9    others, and the recognition of a threat confronting officers in real time as

10   officers were attempting to de-escalate, control and make safe an otherwise

11   potentially violent circumstance.  The focus of this report is on timing issues

12   related to the detection and reaction to a threat perceived through visual

13   stimulus, the number of shots fired in relation to the perceived threat, and the

14   reasonableness of the number of rounds fired in this time frame.

15

16       15.    Initial dispatch – The nature of the dispatch to first responding

17   San Bernardino Sheriff's Deputies, Kunzman and Rose, was regarding a

18   Hispanic man with a gun at 16605 Zenda Street in the City of Victorville

19   CA. (Note Kunzman and Rose were riding as a two man unit.) The details

20   given by dispatchers were that a Hispanic male was pointing a handgun at

21   individuals in the residence.  The refined information was the subject, later

22   identified as Enrique Rodarte, was pointing the gun at the reporting person's

23   brother-in-law, and, there was possibly a second subject involved.  Other

24   units heard the dispatch and began responding to the above address based on

25   the violent nature of the call.

26

1      16.    Arrival – As Deputies Kunzman and Rose were arriving, a dark

2    colored vehicle described as a Suburban was leaving the above residence in

3    an aggressive manner, (i.e. fishtailing) from the alley located to the rear of

4    the residence located at 16605 Zenda.

5

6      17.    Vehicle Pursuit – Upon arriving in the alleyway to the rear of

7    16605 Zenda, Deputies Kunzman and Rose called out the plate of the dark

8    colored Suburban as it aggressively fled the area.  Deputies activated their

9    emergency equipment to attempt a vehicle stop.  The suspect vehicle

10   continued to flee, in disregard of any traffic control signage or the officers

11   activated emergency equipment (lights & siren).  Deputies Rose & Kunzman

12   both witnessed the driver of the suspect vehicle with a weapon in his left

13   hand during the pursuit.  Deputy Kunzman increased his following distance

14   during the pursuit due to the driver of the vehicle pointing the weapon at

15   them.  Both Deputy Kunzman and Rose described the weapon as a "semi-

16   automatic" handgun, black and silver in color, more articulately defined as

17   black with a silver slide or portion of the slide being silver.  During this

18   short pursuit, Deputies Kunzman and Rose broadcast the subject had a gun.

19   Other responding deputies confirmed they heard the broadcast from

20   Kunzman and Rose, announcing the suspect they were pursuing had a gun

21   based on visual confirmation during the pursuit.

22

23     18.    End of Vehicle Pursuit - The pursuit came to an end on Lacy

24   Street where the suspect, Enrique Rodarte, ran over a cluster of mailboxes

25   and drove up onto a raised stack brick retaining wall or planter box, coming

26   off of the first box, driving up onto a second planter box, high centering the

27   vehicle on a second block planter box, where the vehicle came to rest against

C.I.R. (Critical Incident Review) 3484 E. Saddle Avenue, Las Vegas NV 89121          16

1   the brick wall bordering the property at 16725 Lacy Street where Rodarte
2   eventually barricaded.  Deputy Rose described Rodarte's actions as, exiting
3   the vehicle while the vehicle was still in motion, as it rolled on top of the
4   second planter box or retaining wall . When Rodarte exited the vehicle, he
5   turned back toward the driver's door and leaned in as if to retrieve
6   something or leave something behind as described by Deputy Rose. It was
7   unknown which action had taken place at the time based on Rodarte's
8   movements.
9

10      19.    Foot Pursuit – The foot pursuit was short in duration; the
11  suspect vehicle being driven by Rodarte was incapacitated at the property
12  next to the 16725 Lacy Street address.  Deputies Kunzman and Rose stated
13  they cleared the suspect vehicle; they were unsure if there was more than
14  one suspect involved at this time as Rodarte fled the vehicle.  Once the
15  vehicle was quickly cleared deputies continued to give chase on foot stating
16  Rodarte ran into the backyard of 16725 Lacy Street, making entry into the
17  home through the rear door of the residence.  As Rodarte fled the vehicle
18  deputies assumed he was still armed because they had seen the firearm being
19  pointed at them during the pursuit.   During the foot pursuit Rose described
20  Rodarte as a heavyset Hispanic male, wearing a gray Pro-Club t-shirt, white
21  and grey checkered shorts and a white colored fedora style hat.  (Please note
22  this was the same clothing Rodarte had on during the shooting, with the
23  addition of a poncho style jacket).
24

25      20.    Barricade – Deputies carefully pursued Rodarte into the
26  backyard of 16725 Lacy Street and heard what they believed to be a door
27  kick as they began to round the corner.  As Deputies now had a visual on the

1    garage pass through door to the rear of the residence, it appeared to have

2    been kicked open.  Deputies waited for other assisting Deputies to hold the

3    backyard area and subsequently deployed three (3) cans of OC spray into the

4    garage in an attempt to flush Rodarte out of the garage.  After several

5    minutes, Deputies made the decision that Rodarte was not in the garage area,

6    and due to time and distance that deputies were behind Rodarte during the

7    foot pursuit, deputies believed Rodarte to have made entry into the main

8    portion of the residence.  At this time deputies were not certain about other

9    potential occupants in the home. Additional first responding units, in clearly

10   marked and readily identifiable patrol units surrounded 16725 Lacy Street

11   and initiated protocols to employ other resources, i.e. Public Address System

12   (PA), and announcements to the occupants at 16725 Lacy Street.

13   Notifications were then made to specialized units, SED and SWAT.

14

15        21.    Pre-existing Information – The information gathered from the

16   initial dispatch, pre suspect contact, and suspect contact during the vehicle

17   pursuit, foot chase, resulting barricade and subsequent research conducted

18   by officers involved, while on scene, is contributory in establishing the

19   mind-set of officers involved as first responders and secondary

20   officer/deputy resources.  The information gleaned pre-shooting by Deputies

21   Kunzman and Rose was passed on to secondary responders, S.W.A.T. and

22   SED, who are considered additional resources.  Patrol, SWAT and SED

23   were used to contain, slow down the scene and make efforts to de-escalate,

24   control and pursue the lawful objective of taking Enrique Carlos Rodarte

25   into custody based on Rodarte's violent criminal actions, a no-bail felony

26   warrant, and for the safety of the innocent, officers and of the suspect

27   himself.

23.     The following is a list of circumstances discovered by Deputies during the incident and summarized:

1) The nature of the original dispatch – articulate detail of a Hispanic male pointing a firearm at the brother-in-law of the reporting person.

2) The aggressive nature of the suspect vehicle leaving the scene upon officers arriving; suspect vehicle fishtailing and recklessly leaving the scene.

3) Officers having a visual on the suspect and the weapon being brandished by the suspect;

4) The suspect pointing the weapon at them during the pursuit.

5) The suspect's failure to yield to officer's attempts to stop the vehicle while utilizing clearly marked police vehicles and clearly visible and audible emergency equipment.

6) Based on Rodarte's actions, the officers' well founded fears that the Rodarte would barricade, take hostages, or otherwise continue his threatening and violent actions towards other unknown innocents.

7) Research conducted by Deputy Antonio Juarez confirming the identity of Enrique Carlos Rodarte from the reporting person, subsequent to Rodarte barricading at the 16725 Lacy Street Address.   Deputy Juarez also learned that the reporting person believed the firearm being brandished by Rodarte was possibly a black 9mm semi-automatic handgun. At this time Deputy Juarez was advised by the reporting person that Rodarte was known to use heroin, methadone

C.I.R. (Critical Incident Review) 3484 E. Saddle Avenue, Las Vegas NV 89121          19

1    and methamphetamine, and the RP suspected he (Rodarte)

2    was under the influence of illicit narcotics at the time of the

3    incident.

4  8) Deputy Buell confirmed the suspect vehicle involved in the

5    pursuit as being registered to Enrique Carlos Rodarte at the

6    16725 Lacy Street, Victorville CA Address.

7  9) Deputy Kunzman conducted a law enforcement database

8    search to further confirm the identity of the suspect, where it

9    was learned that Enrique Carlos Rodarte was a noted gang

10    member, known primarily for his association with the

11    Barstow Gents. Rodarte also showed two previous arrests in

12    San Bernardino County.  Deputies also, at this time,

13    received information that Enrique Carlos Rodarte had a

14    felony, no-bail warrant for his arrest.

15

16    24.    It is noted in the case documents that the information

17  discovered up to the time of the SWAT/SED briefing was disseminated to

18  all law enforcement personnel directly involved in this incident regarding

19  the identity of Enrique Carlos Rodarte, his known criminal history, criminal

20  associations, and the actions and criminal actions of Rodarte that led to the

21  barricade incident and ultimately Rodarte being shot by officers on scene.

22

23

24

25

1  *Basis of Opinions*

2

3       25.    My opinions in this case are based on my training and

4  experience as a police officer, my experience as a Use-of-Force Training

5  Officer, my experience as a force investigator, my background in analyzing

6  force as it relates to officer/subject interactions, studies and teachings on the

7  subject matter of Use-of-Force, human factors and human behavior and

8  previous use-of-force case review and analysis. Including any applicable

9  pre-seizure conduct that may have lead to the use of force.

10

11      26.    This report is particularly focused on the use-of-force applied

12  by members of the San Bernardino Sheriff's Department, in Victorville, CA

13  at 16725 Lacy Street.

14

15  *Pre-amble*

16      27.    Confidence in decision-making for deputies dealing with

17  agitated and resistant/combative and or violent subjects is established

18  through a knowledge base of applicable factors and application of that

19  knowledge in real time settings, i.e. physical and verbal cues prior to a

20  potential attack, pre-existing knowledge of the suspect, use of the Objective

21  Standards in use-of-force, compliance with SOP's, Policies and applicable

22  case law.

23

24      28.    Threat Cues: The identification of threat cues is imperative in

25  order for an officer to respond quickly and appropriately in rapidly evolving,

26  highly critical scenarios. An officer cannot predict an aggressive, combative

27  and / or violent subject's action with 100% accuracy, but an officer is not

1    expected to be subject to a probable deadly attack prior to responding with
2    deadly force based on the suspect's apparent violent behavior in the moment
3    force is used.

4

5        29.    Human factors: In every critical incident there are factors
6    related to human limitations in action versus reaction scenarios.  At the time
7    of the use-of-force where mechanical processes, actions by the suspect and
8    perceptions, decisions and responses by deputies are occurring, all in
9    fractions of a second, human factors and limitations are present. In these
10   moments decisions are being made, and re-actions are occurring in a
11   response to the suspect's actions, it is important to remember that these
12   elements take time and these increments of time must be recognized and
13   analyzed.

14

15   *Pre-existing information*

16

17       30.    An officer's perception of an incident that is rapidly evolving is
18   enhanced by the presence of any pre-existing knowledge of the subject or
19   knowledge from previous contact.  Deputies involved in this incident had
20   pre-existing knowledge of Rodarte based on Rodarte's aggressive and
21   violent actions when officers first made visual contact with him. Additional
22   information was gathered during the pursuit and during the barricade
23   incident, when officers had time to conduct research through a records check
24   on Rodarte.  This research confirmed Rodarte's identity and his criminal
25   history to include a felony warrant.

26

1    31.    Officers directly involved in the use-of-force are: Detective
2  Brad Bonnet, Deputy Paul Casas, Deputy Jason Fortier, Deputy David Page,
3  and Sergeant John Walker all of the San Bernardino County Sheriff's
4  Department. All law enforcement deputies involved were made aware of
5  Rodarte's violent criminal behavior, criminal history and of the outstanding
6  felony warrant during an incident briefing prior to the shooting and the fact
7  that Rodarte had a firearm and had pointed it at them.

8

9  *Opinion (use-of-Force)*

10

11    32.    Based on the review of documents and the analysis of the above
12  case, including all documentation and recordings provided to me; it is my
13  opinion the force used by Detective Brad Bonnet, Deputy Paul Casas,
14  Deputy Jason Fortier, Deputy David Page, and Sergeant John Walker,
15  (herein after referred to as "Deputies"), was objectively reasonable and
16  within department policy to include the level of force, notably the number
17  of rounds fired, based on the following factors:

18

19    33.    Initial contact: the reason for the contact initiated by deputies
20  was a lawful and necessary contact based on the policies of the San
21  Bernardino Sheriff's Department as they relate to Pursuits, Barricades and
22  Warrants.  Officer's had a legitimate and lawful objective based on the facts
23  and circumstances they were faced with. These facts and circumstances
24  placed officers in legal proximity to be where they were at the time of the
25  shooting.

26

1      34.    Physical and verbal resistance: Rodarte disregarded lawful

2    commands given by deputies in this incident and made subsequent agitated

3    and inflammatory statements and gestures to deputies in an antagonistic

4    response to those commands. Rodarte is on recording and documented to

5    have said, "Fuck you" to deputies on two separate occasions showing

6    continued resistance. Rodarte continued to sabotage deputies' attempts to get

7    him to communicate and get him to comply with lawful commands and to

8    peacefully end the incident by exiting the home in a manner that he was

9    requested to do so.  Deputies made announcements with a public address

10   system in English and Spanish repeatedly for several hours.

11

12     35.    Generally accepted tactics in critical incidents such as this one,

13   are to make every attempt to de-escalate potentially violent subjects verbally

14   when feasible and safe to do so with whatever means are available. In this

15   incident, deputies adhered to this tactic and protocol. First, responding

16   deputies set up a perimeter, secured the perimeter, began making

17   announcements and called in SED/SWAT. This is standard protocol on a

18   barricaded subject, and the full benefit of departmental resources was

19   realized.  During the time deputies were making announcements, Rodarte's

20   brother, Michael Rodarte, exited the residence peacefully and without

21   incident.   Upon Michael's exit he advised and confirmed for Deputies on

22   scene that his brother Enrique Carlos Rodarte had barricaded himself in the

23   attic of the home. In one document, the deputy stated it was articulated that

24   the suspect had a firearm. The following is a snapshot of the recorded

25   transcript from Deputy Page:

1

8          A.   Sure.   Yeah.   Before - umm, the deputy, I

9   forgot his name, gave us the brief, told us that a

10   pursuit, they got into a pursuit with the suspect.

11   During the pursuit, he was holding what they thought

12   possibly was a - they, they saw it was a handgun.

13   They thought it might have been a Beretta.   He was

14   holding it outside of the window during the pursuit,

15   and the vehicle - during the pursuit, the vehicle went

16   off the road, crashed near his residence, and he ran

17   into his residence - and the suspect ran into his

18   residence.   And he said they did not recover a gun,

19   and during - while they were - the original deputies,

20   while they were around the house, calling people out,

21   the suspect's brother came out of the house, and said

22   that the suspect was armed with a handgun, hiding in

23   the attic.

2

3   This statement comes from one deputy, and is a reflection of this deputy's

4   perception of the information relayed by first responding officers.  The fact

5   is, Rodarte was seen with a weapon prior to barricading and no weapon was

6   recovered prior to the shooting. This mindset is not unreasonable based on

7   all of the information available to deputies on scene and the manner in which

8   a highly critical incident evolves.

9

10          36.   Deputy Kunzman confirmed that the man (Michael Rodarte)

11   was not the suspect who had fled the address on Zenda Street, and not whom

1    he had seen with a firearm. This is proof positive that deputies on scene were

2    focused on effectively removing all occupants, including Enrique Rodarte,

3    from the home peacefully.

4

5         37.    After several hours of attempted contact and communication,

6    and having a visual on Rodarte in the home through windows and the

7    doorways, Enrique Carlos Rodarte stepped out onto the porch area and

8    interacted with deputies by yelling at deputies and continuing to ignore

9    officers' commands. Finally, Rodarte began to exit the front door of the

10   residence, positioning himself in what deputies reasonably perceived as a

11   physically aggressive stance; Bladed with his right hand out of sight of

12   officers in a manner consistent with furtive or clandestine manipulation of a

13   weapon; and Rodarte was seen with a weapon in his hand, pointing the

14   firearm at deputies during this same incident earlier in the evening.    It is

15   described by deputies on the scene involved in the use-of-force, that Rodarte

16   had a bottle in his left hand, and was standing partially in the threshold of

17   the home; yelling "fuck you" at the deputies.  Rodarte then thrust his right

18   hand into the pocket of his poncho style jacket and raised his arm up, as if he

19   were concealing a weapon and pointing it towards deputies who were

20   positioned outside of the residence.

21

22        38.    Threat perception: All deputies perceived the threat posed by

23   Rodarte at nearly the same moment.  Rodarte aggressively thrust his right

24   hand into his poncho pocket and raised it towards the deputies, as if he

25   (Rodarte) was in possession of the firearm that was seen in his hand earlier

26   by deputies responding to the call of a man with a gun. Based on the threat

27   perceived, the deputies had a good faith basis to use force to protect them

1   from a probable deadly attack, and to defend themselves against Rodarte in
2   the normal course of their lawful duty to take Enrique Carlos Rodarte into
3   custody.

4

5   *Deadly Force*

6

7        39.    The appropriateness and level of force used to take a person
8   into custody or otherwise de-escalate an otherwise escalating and violent
9   encounter is most often dictated by the suspect and not by the deputies
10  involved.  The use of deadly force is never justified solely to affect a seizure,
11  but only justified by a reasonable belief that there is a necessity to protect
12  life.  Based on all of the information gained during the incident (pre-
13  shooting), Rodarte's pre-existing criminal history and the immediacy of the
14  threat that Rodarte presented to the deputies at the moment, deputies'
15  response to the threat being posed was in defense of their own lives during
16  the course of their lawful duties and the lives of others in the area.

17

18       40.    In this type of rapidly evolving, potentially deadly contact
19  where a subject is acting in a threatening, violent and unpredictable manner,
20  deputies are forced to re-act to the suspect's actions under the compression
21  of time.  The deputies in this situation are expected to act quickly with
22  overwhelming force to thwart a probable deadly attack.  *The Fourth*
23  *Amendment does not require police officers to wait until a suspect shoots to*
24  *confirm that a serious threat of harm exists…No citizen can fairly expect to*
25  *draw a gun on police without risking tragic consequences.  And no court can*
26  *expect any human being to remain passive in the face of an active threat on*
27  *his or her life.* (Hall, 2014)

C.I.R. (Critical Incident Review) 3484 E. Saddle Avenue, Las Vegas NV 89121          27

*Number of shots fired*

41.    In this incident the number of rounds fired by deputies on the scene is reasonable.  In a case such as this, the question should be, when the shots were fired, not how many shots were fired.  The contention in these incidents is that a human being, when shot, responds immediately to the shots being fired and is instantaneously incapacitated.  This belief is simply not the case; a suspect can continue to fight and be a viable threat to officers for a considerable amount of time, even if the wound inflicted is fatal, it is not necessarily instantly fatal.  What is clear is that shots are not justified when the threat has ended, as perceived by the reasonable officer.

42.    Considering paragraph 34, the issues are; when the shots were fired in relation to the threat perceived, what is considered a reasonable time to perceive a deadly threat, make the decision to fire a weapon, and conversely, perceiving a change in the threat, make a decision to reverse the action of firing a weapon, and stop the action of pulling or pressing the trigger in response to the deadly threat.  All of these elements take time that unavoidably factor into the incident.  In a real-world shooting situation, among other factors, an officer's visual and attentional focus at the onset of the "signal to stop" will significantly influence the officer's ability to detect or perceive the signal and then initiate a stopping action. (Lewinski, 2014)

43.    In the "Police Officer Reaction Time to Start and Stop Shooting: The Influence of Decision-Making and Pattern Recognition" study, which provides empirical data on the time required to start and stop shooting a firearm, based on perception, reaction and response, it is

1    understood, that, in response to a simple stimulus, with no decision making

2    involved, the time to perceive the stimulus, re-act, and respond by pulling

3    the trigger to fire a round from a firearm is approximately .31 hundredths of

4    a second including the mechanical element of pulling the trigger.  In the

5    same study with simple go/no go decision making it increases the time to an

6    average of .56 hundredths of a second.  However, neither of these studies

7    gives credence to the fact that these Deputies were faced with the reality of

8    using deadly force (firing weapons) in the face of a perceived deadly attack,

9    and that the stimulus prompting the deputies' decision (Rodarte's actions) is

10   not considered "simple stimulus" or simple decision making (go/no go

11   response), this is considered extremely complex stimulus, therefore, taking

12   longer to respond to the threat presented by Rodarte.  When officers are in a

13   critical, high stress situation with a threatening suspect, they are encouraged

14   to shoot as many rounds as necessary, as quickly as possible, and to continue

15   until the threat stops. (Lewinski, 2014)

16

17       44.    It is known in the field of police work that officers are majorly

18   re-active to the actions of an offender, and that action is faster than reaction.

19   In these short duration human events officers must take what information

20   they have about the subject and the situation, often referred to as recognition

21   primed decision making, along with the actions they are being faced with

22   and be somewhat predictive in formulating a reasonable response to the

23   perceived threat.  With this in mind, no officer is required to wait or can be

24   expected to wait to make the determination that he/she is absolutely certain

25   what it is that a violent offender is going to do or what is in the offenders

26   hand.  Officers/Deputies rely on the information leading up to the moment

27   the decision is made to respond appropriately.

45.     In this incident, deputies on the Hasty team were armed with
M4 fully automatic weapons, with the exception of Detective Bonnet, who
was armed with a Remington 700 bolt-action .308 caliber sniper rifle.
Based on the count down of each deputy's magazines, deputies fired a total
of 45 rounds in response to the threat perceived by deputies.   Based on the
deputies' magazine countdown the following number of rounds were fired:

| | |
|---|---|
| Model 700 Remington | 1 round |
| Colt M4 | 8 rounds |
| Colt M4 | 7 rounds |
| Colt M4 | 8 rounds |
| Colt M4 | 21 rounds |

46.     Time to fall: an element requiring attention in this scenario is
the time it takes a suspect to fall after being struck with an incapacitating or
fatal round.  Research conducted revealed the time it takes for a subject to
fall is an average of 1.23 seconds, in some cases longer depending on many
contributing factors such as inertia (William J. Lewinski, 2016).  Another
element of this phenomenon is the fact that the subject being shot is moving
independently and unpredictably while deputies are shooting.  The results of
the combination of these factors *can* result in bullet wounds in unusual
locations and rounds being fired in what appears to be an excessive amount.
But these facts are consistent with the dynamics of a deadly force
confrontation.

47.     All deputies involved in this shooting made similar statements,
"*that Rodarte fell immediately*" when shots were fired.  The issue at hand

1  here is, what does "immediately" translate to in terms of real time.   Deputy
2  Bonnet, made the following statement;

3        *"Bonnet believed Rodarte was grabbing for a weapon. Bonnet feared Rodarte was going*
4        *to shoot the SWAT personnel on the Hasty Team, who were approximately 15 yards from*
5        *Rodarte. With the belief Rodarte was going to retrieve a weapon and harm the members*
6        *of the Hasty Team, Bonnet fired his rifle toward the center mass of Rodarte's body. As*
7        *Bonnet fired, he heard simultaneous gunshots erupt from the members of the Hasty Team.*
8        *Bonnet re-chambered a round in his rifle and refocused on Rodarte. Bonnet saw Rodarte*
9        *immediately fall to the ground and did not move. Bonnet was unsure if his round struck*
10       *Rodarte, but knew Rodarte was struck by gunfire."*
11

12 In the above statement, Bonnet fired one round, ejected the spent brass, re-

13 chambered a round, refocused on the subject (Rodarte) through the reticule,

14 and watched him fall "immediately."  The above referenced process(s) take

15 time, as does every aspect of a dynamic deadly force occurrence.  In this

16 articulation by Detective Bonnet, it is apparent that with the processes that

17 occurred as described above, the amount of time, an average of 2.5 seconds

18 to cycle through one round fired, chambering another and re-focusing to

19 watch Rodarte fall, through the reticule is a reflection that Rodarte was still a

20 viable threat for up to 2.0-2.5 seconds from the perception of the initial

21 threat and first rounds fired to Rodarte falling and being perceived as no

22 longer a threat to deputies or others.  This articulated process helps us

23 identify the meaning of "immediately" to be approximately 2.5 seconds.

24 This window of time does not represent an instantaneous action.

25 Considering all aspects of the timing issues, it is reasonable for officers to

26 have fired individually the number of rounds fired.  The officer firing the

27 most rounds, Deputy Page, firing what he described from recall as two 8-10

28 round bursts which happened in less than two seconds.  With a weapon

29 capable of firing 12 rounds per second (Colt, 2016), this shows that the

30 number of rounds fired was reasonable based on all of the above-mentioned

31 factors.  Another factor is wound direction; all of the wounds on Rodarte's

1    body were listed by the coroner as "front to back," some of the wound paths
2    had a downward direction that are consistent with Rodarte falling forward.
3    During the time Rodarte was falling, he was still a viable threat from the
4    deputy's perspective. The actual number of rounds fired by Deputy Page
5    was 21.  Two full auto presses at less than one second per press, in the face
6    of a deadly attack is not unreasonable. (As stated, based on the low end of
7    the specification range for the M4 of 12 rounds per second) (Colt, 2016)
8
9        48.    The time elapsed from the first shot to the last shot fired is 2.04
10    seconds.  This time is determined by placing the belt recordings in recording
11    software (Adobe Premier Pro), identifying the stems and audible information
12    and comparing it to the time line generated in the above software.  In this
13    screen capture, the time laps of the rounds being fired is reflected as 2.04
14    seconds, the indicator line shows the location on the time line. (See photo
15    below)



16
17
18        49.    Each deputy perceived the threat Rodarte presented at nearly
19    the same moment in time and fired respective weapons simultaneously.
20    Each individual deputy is responsible for their own safety the safety of other
21    deputies and innocent civilians in the face of a perceived deadly threat.

1   Based on the M4 rifle specifications, the M4 Carbine is capable of firing
2   700-950 rounds per minute, 12-16 rounds per second depending on the
3   round being used. (Colt, 2016)  This specification quantifies the fact that
4   deputies individually did not respond with excessive force in terms of the
5   number of rounds fired.  In many cases officers/deputies will shoot a suspect
6   even after the subject falls.  This is due to the fact that a subject that is
7   potentially armed that has fallen at the hand of an officer is not necessarily a
8   diminished threat after the subject falls to the ground.   In this case
9   particularly, deputies showed restraint and a high level of assessment skill in
10  the "stop shooting" process, as indicated by the bullet paths on the suspect
11  being front to back with no additional rounds being fired after the subject
12  fell forward during the perceived attack.  Real time must elapse, and is
13  immutable and unavoidable in a critical incident, the comparisons of these
14  times are significant to establish the appropriateness of the deputies'
15  response. (Hall, 2014)
16
17      50.    What often causes controversy with officer-involved shootings
18  is the inability of officers to immediately cease-fire at this perceived signal.
19  This occurrence has been at the root of many legal cases, often resulting in
20  officers being accused of excessive use of force for any number of additional
21  rounds fired, particularly if the location of the shots fired indicated that the
22  officer was no longer in danger as the deceased or wounded subject was
23  falling through the plane of gunfire or had turned. In a number of situations,
24  officers have faced harsh media and legal criticism for using multiple rounds
25  to stop deadly offenders while defending their own and others'
26  lives.(Lewinski, 2014)
27

1    51.   Considering the totality of the facts and circumstances at the
2   moment Rodarte aggressively reached into his jacket/poncho pocket, an
3   action that deputies quickly identified, through training and experience, as
4   an imminent deadly attack, the deputies need to apply force was necessary
5   and reasonable.  *The constitution simply does not require officers to gamble*
6   *with their lives in the face of serious threat or harm*" (Hall, 2014)

7

8   ***Conclusion***

9

10    52.   It is my conclusion, based upon the materials presented,
11   coupled with my specialized education, training, experience as a police
12   officer, police training officer, investigator and continued research and
13   review of police operations and use-of-force incidents that the use-of-force
14   by Deputy Brad Bonnet, Deputy Paul Casas, Deputy Jason Fortier, Deputy
15   David Page, and Sergeant John Walker, was objectively reasonable to
16   control and de-escalate this incident, which was consistent with generally
17   accepted practices and tactics in law enforcement in being confronted by a
18   violent offender under the circumstances described herein.

19

20    53.   It is my understanding that additional materials may be in
21   process of being produced or may be requested later. Should any subsequent
22   information be produced and materially affect or alter any of these opinions,
23   I reserve the right to submit a supplemental report.

24

25    54.   I am not tasked with identifying potential truthfulness issues in
26   the statements reviewed and will not offer any opinion on the truthfulness of
27   the interviews or the accuracy of the transcribed documents I have reviewed.

1   At the time of this report I have no other source of information other than

2   those supplied to me in reference to this incident.  I have reviewed reports

3   and documents supplied to me by Manning & Kass, Ellrod, Ramirez, and

4   Trester LLP.  I have not conducted any independent interviews with any of the

5   involved persons or other witnesses in this case.  My opinion on this use-of-

6   force is based on only the documents reviewed.

7

8   Thank you,

9

10  James W. Borden

11

12

13

14

15

16

17

18

19  **Works Cited**

20  Colt. (2016 19-July). *Colt Specifications.* (colt, Producer, & colt) Retrieved 2016 19-
21  July from Colt: http://www.colt.com/catalogue/military/products/colt-M4-Carbine

22  Hall, J. C. (2014). *In defense of self and others.* Durham, North Carolina, US: Carolina
23  Acedemic Press.

24  Lewinski, W. J. (2014). Police Officer Reaction Time to Start and Stop Shooting: The
25  Influence of Decision-Making and Pattern Recognition. *Law Enforcement Executive*
26  *Forum , 14* (2), 1-16.

27  William J. Lewinski, D. A. (2016 14-17-May). Falling Subjects and the Use of Force.
28  *The Police Chief Magazine .*

1